**STATE of Maine**

v.

**Dale Allen WOOD.**

Supreme Judicial Court of Maine.

Argued June 6, 1995.

Decided July 25, 1995.

Andrew Ketterer, Atty. Gen., Wayne S. Moss (orally), Asst. Atty. Gen., Augusta, for the State.

Stuart W. Tisdale, Jr. (orally), John E. Nale, Portland, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

ROBERTS, Justice.

Dale Allen Wood appeals from a judgment of conviction entered on a jury verdict in the Superior Court (Penobscot County, *Browne, A.R.J.*) on one count of intentional or knowing murder, 17–A M.R.S.A. § 201(1)(A) (1988), and one count of robbery with the use of a firearm against a person, *id.,* §§ 651(1)(B)(2), (1)(E), 1252(5) (1988). He challenges the failure to suppress statements made by him to the police, the failure to grant a mistrial, and the failure to give a requested jury instruction. Wood has also been granted leave to appeal the 65–year sentence imposed on the murder conviction. We consider his direct appeal from the judgment of conviction together with his appeal of the sentence, and affirm both.

On Saturday, August 8, 1992, Zachary Walston traveled from Lubec to Bangor for the weekend and checked in at the Holiday Inn on Main Street. Early in the morning of August 9, Walston picked up Dale Wood who was hitchhiking at the intersection of 14th and Ohio Streets in Bangor. At Wood's request, Walston stopped at a 7–11 store where he bought some beer for Wood. Wood then asked him to turn onto Finson Road. Partway down Finson Road, Wood told Walston that he needed to urinate. Walston pulled over and Wood stood to the side of the road where he pretended to urinate. After a few seconds, Wood turned and pointed a gun at Walston, demanding money. When Walston denied having any money, Wood checked his pockets and removed $30. He then told Walston to kneel in the bushes at the side of the road.

Wood killed Walston by firing a single round from a .22–caliber semiautomatic Ruger into Walston's head about two inches above his left ear. Although Wood maintained that he fired the fatal shot from the roadway, some 15 to 20 feet away from Walston, Detective Ronald Gastia of the Bangor Police Department found the spent shell casing only 4 to 5 feet away from the head of Walston's corpse. The jury would therefore have been justified in concluding that Wood followed Walston into the bushes and fired the shot from a range of 2 to 5 feet.

At the trial, Wood conceded that he had killed Walston. He argued, however, that self-induced intoxication prevented him from forming the culpable state of mind required for a conviction of intentional or knowing murder. The jury found him guilty. Wood was sentenced to 65 years for the murder conviction and 20 years, to be served concurrently, for the robbery conviction. These appeals followed.

## I.

### Appeal of Conviction

*A. Motion to Suppress*

The Bangor Police Department first became aware of Wood's potential involvement in Walston's murder on October 15, 1992. At that time, Roger Cote, an acquaintance of Wood, told Detective Gary Higgins of the Bangor Police Department that during a conversation at Judy's Bar in Bangor Wood had admitted killing Walston. As a result of Cote's tip, the state police crime lab was able to match Wood's thumbprint with a thumbprint found on a photograph recovered from Walston's car.

Bangor police remained unaware of Wood's whereabouts until November 22, 1992, when Wood was arrested by Waterville police on a bench warrant issued as a result of his failure to appear to begin serving a prison sentence for an unrelated crime. Higgins and fellow Bangor detective Fred Clarke transported Wood back to Bangor. After explaining Wood's constitutional rights, they interrogated him on a broad range of topics.

Without telling Wood that he was a suspect in the Walston homicide, Higgins and Clarke asked him about a scuffle at Judy's Bar during which Wood purportedly showed the .22–caliber handgun to an acquaintance. After Clarke assured Wood that "no charges [were] being pressed" in connection with the scuffle, Wood admitted to having possession of the gun. Clarke then reiterated that "there are no robbery charges or anything like that that are going to be pending on it because obviously nobody was robbed." He

then asked Wood to confirm that the gun incident had taken place.

Later in the interview, Clarke and Higgins told Wood that he had been named by an informant as a suspect in the Walston case and that his fingerprints had been lifted from Walston's car. Initially, Wood denied any involvement. Clarke and Higgins attempted to get Wood to tell them where the gun from the Judy's Bar incident might be found. When Wood appeared reluctant to do so, Higgins told him, "You're not, you know, you're not in trouble for the gun; we just want to find out what the truth is." Wood then acknowledged that his cousin from Connecticut had taken the gun.

After further interrogation, Wood admitted that he had been in the car at the time of Walston's killing, but insisted that he had only been a bystander. Clarke and Higgins attempted to get Wood to confirm that the gun used in the killing was the same gun that he already admitted having in his possession after the shooting. Again, Clarke assured Wood that neither he nor his cousin in Connecticut would be in trouble as a result of possessing the handgun. Wood admitted that the gun used in the shooting was "in Connecticut."

Eventually, Wood named a third person as the trigger man. He placed two monitored phone calls to the third person, attempting unsuccessfully to induce him to make incriminating statements. When the November 22 interview ended, Wood continued to maintain that this other individual had pulled the trigger. On November 23, Wood asked to speak with the detectives again. At first, he attempted to recant everything he had said the day before. Shortly thereafter, he admitted to being the only person present and acknowledged that he alone had committed the acts that he had attempted to attribute to the other individual.

Prior to the trial, Wood filed a motion to suppress the statements given during the November 22 and 23 interviews. He argued that the police had induced his incriminating responses by promising that he would not be prosecuted for the incident at Judy's Bar or for the possession of the stolen handgun. The court (*Kravchuk, J.*) denied the motion.

■ The State bears the burden of proving to the court's satisfaction that a confession is voluntary beyond a reasonable doubt. *State v. Tardiff,* 374 A.2d 598, 600 (Me.1977). "A confession is voluntary if it results from the free choice of a rational mind, if it is not a product of coercive police conduct, and if under all of the circumstances its admission would be fundamentally fair." *State v. Mikulewicz,* 462 A.2d 497, 501 (Me.1983). On appeal we will affirm the court's factual finding that a statement was voluntary if it is supported by a rational basis in the record. *State v. Tardiff,* 374 A.2d at 600.

■ In this case, the court did not interpret the statements of Clarke and Higgins as improper promises of leniency. They repeatedly told Wood that they had no control over charging decisions or sentencing. Even if we construe the detectives' statements as promises of leniency, those promises do not render irrational the court's finding that Wood's statements with regard to the Walston shooting were voluntary beyond a reasonable doubt. *See State v. Hutchinson,* 597 A.2d 1344, 1346 (Me.1991) ("Defendant's argument that he believed the officers to be making an implied promise of leniency by telling him that the truth would 'clear things up,' even if true, is insufficient to controvert the trial court's finding of voluntariness.").

## B. *Testimony of Medical Examiner*

At the trial, the State called Dr. Henry Ryan, chief medical examiner, to testify to the cause and manner of Walston's death. Ryan explained that Walston's death had been caused by a bullet wound to the head. When the State asked Ryan to describe the manner of death, defense counsel asked to approach the bench. Anticipating that Ryan would answer that the death was a homicide, counsel asked that the jury be instructed that homicide means only that the death was caused by another human being and that homicide is not the same as murder. The court suggested that the State could prevent the problem merely by agreeing to ask Ryan to explain the technical definition of the term. Wood acquiesced in the suggested procedure.

As expected, Ryan testified that Walston's death was a homicide. The State then asked him to explain the significance of that conclusion. To the surprise of all present, Ryan responded that his conclusion meant that the death "was not a natural death and it was not caused by the person themselves and that there appeared to be an element of intent in it." Wood immediately objected and moved to strike Ryan's response. The court, which failed to hear Ryan's response, asked to have the testimony read back, apparently in front of the jury. Although the court instructed the jury to disregard Ryan's remarks, Wood nonetheless moved for a mistrial and preserved his objection to the court's denial of that motion.

■ We acknowledge "the danger inherent in allowing a medical expert to testify in terms which express legal conclusions rather than conclusions which are clearly within the specialized knowledge of the expert." *State v. Young*, 662 A.2d 904, 907 (Me.1995) (quoting *State v. Mishne*, 427 A.2d 450, 459 (Me. 1981)). Such testimony presents the possibility that the expert might invade the exclusive province of the factfinder. In order to minimize that danger, we have held that a medical expert generally may not testify as to the state of mind of a criminal defendant. *See State v. Flick*, 425 A.2d 167, 171 (Me. 1981). In this case, Wood properly objected to the medical examiner's testimony that this homicide involved an element of intent.

■ Nevertheless, it does not necessarily follow that Wood was entitled to a mistrial. The trial court's decision to give a curative instruction instead of granting a motion for a mistrial is usually within the court's discretion. *State v. Hilton*, 431 A.2d 1296, 1302 (Me.1981). Moreover, the trial court "should deny a motion for a mistrial except in the rare case when the trial cannot proceed to a fair result and no remedy short of a new trial will satisfy the interests of justice." *State v. Harnish*, 560 A.2d 5, 8 (Me.1989) (quoting *State v. Mason*, 528 A.2d 1259, 1260 (Me. 1987)). When reviewing the denial of a motion for a mistrial, we presume that the jury will follow a curative instruction. Such an instruction will be considered inadequate only when there are exceptionally prejudicial circumstances or prosecutorial bad faith. *State v. Naoum*, 548 A.2d 120, 123 (Me.1988).

The inadmissible testimony in this case was not the result of prosecutorial misconduct. Indeed, it appears that the State asked the question that resulted in the inadmissible testimony at the suggestion of the court. Moreover, the inadmissible testimony is not exceptionally prejudicial in the circumstances of this case. The trial court immediately gave the requested curative instruction. It repeated that instruction in its charge to the jury. Given the prompt curative instruction in this case, Ryan's statement was not exceptionally prejudicial.

### C. Intoxication Instruction

■ The court instructed the jury on the proper definition of "knowingly" and "intentionally" within the meaning of 17–A M.R.S.A. § 201(1)(A). It then explained that a reasonable doubt as to the presence of either of those elements can arise from evidence of self-induced intoxication. It cautioned the jury, however, that the ultimate question was not whether the defendant was intoxicated, but whether the defendant caused the death intentionally or knowingly. The court instructed the jury that it must consider the lesser offense of manslaughter if it concluded that the State had failed to establish that Wood acted intentionally or knowingly. After defining manslaughter by reckless conduct, the court instructed the jury that self-induced intoxication is immaterial to the defendant's failure to be aware of a risk of which he would have been aware if not intoxicated.

The essence of Wood's argument is that the court's instruction failed clearly to explain that the intoxication defense does not apply to manslaughter. As a result, he argues, the jury may have believed that it had to acquit Wood if it believed he was intoxicated. The record shows, however, that the trial court explained that intoxication can give rise to a reasonable doubt as to the *mens rea* required for murder, that the jury had to consider manslaughter if it found Wood not guilty of murder, and that intoxication was immaterial to the crime of man-

slaughter. We discern no error in the instruction as given.

## II.

### Appeal of Sentence

 The proper procedure for computing a sentence is set forth in *State v. Hewey*, 622 A.2d 1151 (Me.1993). First, the sentencing court must compute a basic period of incarceration within the prescribed statutory range "*solely* by reference to the offender's *criminal conduct* in committing the crime, that is, 'by considering the particular nature and seriousness of the offense without regard to the circumstances of the offender.'" *Id.* at 1154 (quoting *State v. Weir*, 600 A.2d 1105, 1106 (Me.1991)). The statutory range of a sentence for murder is 25 years to life. 17–A M.R.S.A. § 1251 (Supp.1994). We review the basic period of incarceration for "misapplication of principle." *State v. Hewey*, 622 A.2d at 1155.

Next, the sentencing court must compute the maximum period of incarceration considering both mitigating and aggravating factors, if any. *Id.* at 1154. In recognition of the court's "superior posture for evaluating evidence of the circumstances of the offender, we accord greater deference to the weight and effect given by the court to those factors peculiar to a particular offender." *Id.* at 1155. Because the *Hewey* procedure implicates two different standards of review, it is important that the trial court comply with that procedure.[1] *Id.*

Although the sentencing court did not follow strictly the procedure established in *Hewey*, it could have selected a 65–year basic period of incarceration without error in principle. The court could have concluded, based on the evidence at trial and the information adduced at sentencing, that Walston was the victim of Wood's premeditated plot to rob and murder somebody. Those facts support a conclusion that the killing was a cold-blooded execution. Although Walston may have felt little pain, he was probably aware of his impending fate for several min-

utes prior to the killing. Those factors reveal the type of cruelty and inhumanity that would justify a sentence in the range of 50 to 75 years.

In the alternative, the court could have selected a basic period of incarceration in the 40– to 60–year range, with an additional 10 to 20 years to reflect aggravating circumstances. Wood demonstrated little remorse. He was initially apprehended in part because he bragged in a bar about "offing" someone. He continued to insist even at his sentencing that the shooting was an accident. Moreover, the presentence report revealed that Wood had an extensive criminal history. Although his record involved nonviolent offenses, the court would have been justified in concluding that Wood presented a poor prospect for rehabilitation.

Wood's claim that the 65–year sentence is a *de facto* life sentence is without merit. Although we have never considered the question directly, we have suggested that a sentence for a term of years must be viewed objectively in evaluating whether it constitutes a *de facto* life sentence. *State v. Goodale*, 571 A.2d 228, 229 (Me.1990). In that case, we stated that a 75–year sentence did not constitute a *de facto* life sentence. *Id.* Moreover, as the State points out, Wood could conceivably be released in approximately 38 years if he accumulates all the potential time deducted for good behavior pursuant to 17–A M.R.S.A. § 1253(3) (Supp. 1994).

The entry is:

Judgment of conviction affirmed.

Sentence affirmed.

All concurring.

---

1. For crimes other than murder, the sentencing court would also consider whether to suspend a portion of a sentence. By statute, a split sentence is not available to persons convicted of murder. 17–A M.R.S.A. § 1201(1)(A) (Supp. 1994).