2000 ME 14

**STATE of Maine**

v.

**Richard SWEET and Paul Poulin.**

Supreme Judicial Court of Maine.

Argued Nov. 1, 1999.

Decided Jan. 31, 2000.

David W. Crook, District Attorney, Alan P. Kelley, Deputy Dist. Atty. (orally), Augusta, for State.

Jeffrey P. Towne (orally), Waterville, for defendant Richard Sweet. John O'Donnell (orally), Tilton & O'Donnell, Waterville, for defendant Paul Poulin.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, and CALKINS, JJ.

SAUFLEY, J.

[¶ 1] Richard Sweet and Paul Poulin appeal from sentences of 40 years and 65 years respectively entered in the Superior Court (Kennebec County, *Alexander, J.*). They challenge the use of the enhanced statutory range of 20 to 40 years for Class A charges of gross sexual assault, the imposition of consecutive sentences, and the length of the sentences in their entirety. We affirm the sentences.

## I. BACKGROUND

[¶ 2] Richard Sweet is today approximately 47 years old. He was first convicted of gross sexual misconduct in 1984, as a result of charges related to five separate child victims. He was sentenced to ten years in prison and was released in 1991. Within months of his release, he was convicted of terrorizing (Class D) as a result of threats directed toward one of the victims of his previous gross sexual misconduct charges. He was sentenced to seven days in the county jail.

[¶ 3] Paul Poulin is today approximately 32 years old. Before the events at issue, he had been convicted of multiple burglaries, both Class C and Class B. According to his own journal entries, he was a member of N.A.M.B.L.A. (North American Man–Boy Love Association) and began sexually assaulting young boys in the early 1990s. He described himself as a "boy-lover," and spent much of his time and energy finding and grooming young boys, in the age range of 10 to 14, for sexual activities.

[¶ 4] Sweet and Poulin worked together and began a consensual sexual relationship in September 1994. Shortly thereafter, Poulin informed Sweet that he was a "boy-lover," and the two began discussing the possibility of introducing an adolescent boy into their relationship. Over the course of the next two years, Sweet and Poulin used alcohol, drugs, gifts, money, and pornography to lure and groom young adolescent boys into sexual relationships. The victims from which the charges stem were 13 and 14 years old. Allegations of sexual abuse surfaced after one of those boys contacted authorities. In October of 1997, both Sweet and Poulin were indicted and charged with multiple sexual assault crimes involving a total of four children.

[¶ 5] Sweet pled guilty to one count each of gross sexual assault (Class A) and sexual abuse of a minor (Class C) committed against a thirteen-year-old boy; one count of sexual abuse of a minor (Class C) perpetrated against a second victim; and one count of conspiracy to commit gross sexual assault (Class B). Poulin pled guilty to one count each of gross sexual assault (Class A), unlawful sexual contact (Class C), and sexual abuse of a minor (Class C) committed against one victim; gross sexual assault (Class A) and unlawful sexual contact (Class C) against a second victim; sexual abuse of a minor perpetrated against a third victim; and conspiracy to commit gross sexual assault (Class B).

[¶ 6] Applying *State v. Hewey*, 622 A.2d 1151 (Me.1993), as codified at 17–A M.R.S.A. § 1252–C (Supp.1999), the sen-

tencing court entered basic sentences of 15 years for each gross sexual assault count. The court also determined that the nature of the crimes and the prior criminal histories of each defendant warranted sentencing in the upper tier of 20 to 40 years on the gross sexual assault charges. On both of Poulin's gross sexual assault charges the court set the maximum sentence at 30 years and determined that the sentences should run consecutively. On Sweet's single conviction for gross sexual assault, the court set the maximum sentence at 35 years.

[¶ 7] In addition, the court sentenced both Sweet and Poulin to five years on each charge of unlawful sexual contact and sexual abuse of a minor. All charges related to the same victim ran concurrently and those related to different victims ran consecutively. Finally, the court sentenced each defendant to ten years on the charges of conspiracy to commit gross sexual assault to run concurrently with the gross sexual assault charge. After considering each of the defendants' prospects for rehabilitation, the court declined to suspend any of the sentences.

[¶ 8] The sentences as a whole resulted in a 65–year period of incarceration for Poulin: 30 years for gross sexual assault of one victim, followed by a consecutive 30 years for the second gross sexual assault of a second victim, followed by a consecu-tive five years for sexual abuse of a minor related to a third victim. Sweet was sentenced to a 40–year period of incarceration: 35 years for gross sexual assault of one victim, followed by a consecutive five years for sexual abuse of a minor related to a second victim.

## II. DISCUSSION

[¶ 9] The defendants assert that the sentencing court erred by improperly establishing sentences for the gross sexual assault charges in the enhanced range of 20 to 40 years. They further claim that the sentencing court abused its discretion when it entered consecutive sentences and that the sentences are, taken in their entirety, excessive.

### A. Sentencing Framework

[¶ 10] Criminal sentencing is one of the most difficult responsibilities of a judge. Within certain parameters, the judge is given the discretion to fashion an individual sentence. That discretion must be exercised in a way that meets often competing goals.[1] For example, the court must both individualize the sentence to the particular defendant, 17–A M.R.S.A. § 1151(6) (1983), and must at the same time "eliminate inequalities in sentences that are not related to legitimate criminological goals," 17–A M.R.S.A. § 1151(5)

---

1. Title 17–A, section 1151 provides that the general purposes of punishment are:

    1. To prevent crime through the deterrent effect of sentences, the rehabilitation of convicted persons, and the restraint of convicted persons when required in the interest of public safety;

    2. To encourage restitution in all cases in which the victim can be compensated and other purposes of sentencing can be appropriately served[;]

    3. To minimize correctional experiences which serve to promote further criminality;

    4. To give fair warning of the nature of the sentences that may be imposed on the conviction of a crime;

    5. To eliminate inequities in sentencing that are unrelated to legitimate criminological goals;

    6. To encourage differentiation among offenders with a view to a just individualization of sentences;

    7. To promote the development of correctional programs which elicit the cooperation of convicted persons; and

    8. To permit sentences which do not diminish the gravity of the offenses, with reference to the factors, among others, of:
        A. The age of the victim; and
        B. The selection by the defendant of the person against whom the crime was committed or of the property that was damaged or otherwise affected by the crime because of the race, color, religion, sex, ancestry, national origin, physical or mental disability or sexual orientation of that person or of the owner or occupant of that property.

    17–A M.R.S.A. § 1151 (1983 & Supp.1999).

(1983). In other words, while addressing the many goals of sentencing, the court must endeavor to create consistency among sentences for similar crimes and must, at the same time, tailor the sentence to the individual defendant.[2]

[¶ 11] In order to place all of the differing considerations into a manageable framework, the sentencing court must engage in the analysis first announced in *Hewey*, 622 A.2d at 1151, and now codified at 17–A M.R.S.A. § 1252–C. This analysis, commonly referred to as a Hewey Analysis, requires the court to undertake three steps. First, the court must determine a basic sentence based solely on the nature and seriousness of the offense.[3] Next, the court must examine the crime and all relevant mitigating and aggravating factors in order to establish an individualized maximum sentence. Finally, the court must set a final sentence, determining how much of the sentence, if any, should be suspended and what circumstances and conditions of probation, if any, should be ordered. *See State v. Bolduc*, 638 A.2d 725, 727 (Me.1994).

[¶ 12] When, as here, the defendant has been convicted of one or more Class A crimes, "the court must engage in an additional preliminary step to determine whether the crime falls within the higher tier of Class A sentences." *State v. MacDonald*, 1998 ME 212, ¶ 15, 718 A.2d 195, 199; *see also* 17–A M.R.S.A. § 1251(2)(A) (1983). In this context, "[t]he court may consider a serious criminal history of the defendant and impose a maximum period of incarceration in excess of 20 years based on either the nature and seriousness of the crime alone or on the nature and seriousness of the crime coupled with the serious criminal history of the defendant." 17–A M.R.S.A. § 1252(2)(A) (Supp.1999). Accordingly, depending on the nature of the crime and the defendant's criminal history, the highest sentence available for a Class A crime may be either 20 years or 40 years.

B. Standards of Review

[¶ 13] Because of the complexity of the multiple steps comprising our sentencing process, the standards of review for each individual step must be understood before an examination of the sentence itself is appropriate.

[¶ 14] We review the "basic" sentence, set by the court pursuant to 17–A M.R.S.A. § 1252–C(1), for misapplication of principle. *See State v. King*, 1998 ME 60, ¶ 14, 708 A.2d 1014, 1018; *State v. Carr*, 1998 ME 237, ¶ 6, 719 A.2d 531, 533; *State v. Pfeil*, 1998 ME 245, ¶ 14, 720 A.2d 573, 577; *State v. Wilson*, 669 A.2d 766, 768 (Me.1996). Similarly, we review the sentencing court's determination that a Class A crime falls in the enhanced range of 20 to 40 years for misapplication of principle. *See MacDonald*, 1998 ME 212, ¶ 15, 718 A.2d at 199; *State v. Shackelford*, 634 A.2d 1292, 1295–96 (Me.1993).

[¶ 15] Because the sentencing court is in a better position to review

---

**2.** Along with a number of purposes and goals of sentencing that are intended to assist the court in considering all of the information necessary and appropriate to the exercise of its discretion, *see* 17–A M.R.S.A. § 1151, the court is also required to consider the effect of the crime on the victim, *see* 17–A M.R.S.A. §§ 1171–1174 (1983 & Supp.1999) and to consider where the defendant will be incarcerated if a term of imprisonment is imposed, *see* 17–A M.R.S.A. § 1252(7) (Supp.1999).

**3.** In order to undertake the first step in the analysis, that is, to establish the "basic term," the court must necessarily first identify the

legal parameters within which a sentence may be imposed for the crime at issue. This preliminary step requires the court to articulate the very highest sentence and the very lowest sentence available at law. At this point in the analysis, the court must also be aware of factors that would change the class of the crime. For example, if the crime is alleged and proved only as an attempt, the crime will be generally one class lower. *See* 17–A M.R.S.A. § 153(4) (1983). If the crime was committed with a weapon, the crime will, in most instances, be one class higher. *See* 17–A M.R.S.A. § 1252(4) (1983).

aggravating and mitigating factors, we review its "maximum" sentence, entered pursuant to 17–A M.R.S.A. § 1252–C(2), for abuse of discretion. *See State v. Lewis,* 1998 ME 83, ¶ 8, 711 A.2d 119, 123–24; *Pfeil,* 1998 ME 245, ¶ 18, 720 A.2d at 578. We also review the sentencing court's decision to suspend any part of the maximum sentence for abuse of discretion. *See Pfeil,* 1998 ME 245, ¶ 19, 720 A.2d at 578; *State v. Ardolino,* 1997 ME 141, ¶ 26, 697 A.2d 73, 81. Finally, we review the sentencing court's decision to apply sentences consecutively for abuse of discretion, *see State v. Shulikov,* 1998 ME 111, ¶ 28, 712 A.2d 504, ·511–12; *State v. Prewara,* 687 A.2d 951, 954 (Me.1996), or error of law, *see State v. Fleming,* 644 A.2d 1034, 1035–36 (Me.1994); *State v. Brooks,* 634 A.2d 1265, 1267 (Me.1993).

### C. The Sentences Imposed on Sweet and Poulin

#### 1. Enhancement of Class A Sentences to the Higher Tier

■ [¶ 16] Sweet and Poulin argue that the court erred in determining that the sentences for the Class A gross sexual assaults fall in the upper tier of sentences, allowing sentences of up to 40 years. They argue that the court misapplied the provisions of 17–A M .R.S.A. § 1251(2)(A) by considering more than the nature of the crimes and the criminal histories of the defendants in its analysis, and more generally, that the court erred in concluding that these crimes were among the most heinous ways that a gross sexual assault can be committed. We disagree.

[¶ 17] We first address the court's application of 17–A M.R.S.A. § 1251(2)(A). At sentencing, the court clearly articulated the factors to be considered in determining whether the upper or lower tier was applicable to the crimes before it: "So we can

consider prior record in addition to the heinousness or lack of heinousness of any particular crime in deciding whether the matter is tipped over into the second tier." The court then discussed the nature and seriousness of the crimes and the criminal histories of the defendants. Although the court did not pause and announce explicitly that the second tier was appropriate in sentencing both defendants on the gross sexual assault charges, its conclusion was unmistakable. Moreover, when it reached the determination of maximum sentences, the court considered the full panoply of aggravating and mitigating factors, *see* 17–A 17 M.R.S.A. § 1252–C(2), and reiterated the specific factors it had considered in reaching the second tier.[4] Although defendants' confusion from reading the cold record of the sentencing is understandable, on close review of the court's articulation of its decisions, we discern no error in the application of 17–A M.R.S.A. § 1251(2)(A).

■ [¶ 18] We next address the defendants' contention that the court engaged in a misapplication of principle when it found that the sentences met the criteria for the upper tier. Primarily, Sweet and Poulin argue that their conduct leading to the gross sexual assault charges was not violent, and therefore enhanced sentences were inappropriate. They are correct that their conduct did not include forced, precipitously violent, or injury-producing conduct. Rather, their method of obtaining victims had as its center point coercion, not physical violence. Stripped to its essence, their goal was to create *willing and eager* sexual partners of children. By their actions, they exposed their victims to an environment of sex, alcohol, and pornography. They undertook these actions with boys whose ages placed them at the cusp of sexual development. Their actions in this regard may well have created

---

4. Those factors included "factors which the Law Court has specifically indicated can justify going into the second tier, the heinousness of the crimes, which are particularly heinous here in terms of the taking advantage of the

special needs kids and things like that and— which the Legislature has imposed and can justify going into the second tier by allowing the prior record to support going into the second tier."

greater long-term damage to their victims than a violent one-time assault could have done.[5] In addition, the young victims were subjected to anal penetration, attempted penetration, and a variety of other physically intrusive sexual activities. We conclude, as did the sentencing court, that such conduct is sufficiently heinous that the absence of precipitous violence does not preclude a sentence in the upper tier.

### 2. Consecutive Sentences

[¶ 19] Sweet and Poulin next challenge the court's imposition of consecutive sentences. In Sweet's case, a five-year sentence was added consecutively to the 35–year sentence on the gross sexual assault sentence. In Poulin's case, the imposition of consecutive sentences had a greater impact. He was sentenced to 30 years on each of the gross sexual assault charges. Because the charges related to different victims, the court ordered the two 30–year sentences to be served consecutively. Added to the consecutive five year sexual abuse of a minor sentence on the third victim, these sentences result in the 65–year term that Poulin will have to serve. We review the sentencing court's decision to impose consecutive sentences for abuse of discretion. See Shulikov, 1998 ME 111, ¶ 28, 712 A.2d at 511–12; Prewara, 687 A.2d at 954.

[¶ 20] We recognize that the action of imposing consecutive sentences has resulted in final sentences, particularly in Poulin's case, that are at the high end of sentencing, even for such heinous crimes. The Legislature has, however, approved consecutive sentences in certain circumstances. See 17–A M.R.S.A. § 1256(2) (1983 & Supp.1999). Specifically, section 1256(2) provides that consecutive sentences are proper if: (1) the "convictions are for offenses ... arising from different criminal episodes"; (2) the "defendant was ... on probation ... at the time the person committed a subsequent offense"; or (3) the "seriousness of the criminal conduct involved ... or the seriousness of the criminal record of the convicted person, or both, require a sentence of imprisonment in excess of the maximum available for the most serious offense." 17–A M.R.S.A. § 1256(2)(A), (B), & (D); see also Shulikov, 1998 ME 111, ¶ 12, 712 A.2d at 512.

[¶ 21] Most, if not all, of those factors were present as to each defendant. Both Sweet and Poulin were on probation during part or all of the time during which these offenses were committed.[6] The charges arose from different criminal episodes, involving the victimization of two boys in Sweet's case and three boys in Poulin's case. The serious nature of the crimes against these children cannot be disputed. In each instance, the defendants "groomed" the boys for sexual encounters. This included giving them drugs or alcohol, exposing them to "man/boy" pornography, and encouraging the boys to engage in sexual activities with each other. Both defendants were aware that their actions were criminal and that they were at grave risk of lengthy incarceration for those acts. Nonetheless, they continued their pursuit of children as sexual partners. They chose their victims for their vulnerability and naiveté. They destroyed or badly damaged the natural sexual and emotional development of these boys. On these facts, we cannot say that the court abused its discretion when it determined that consecutive sentences were necessary and appropriate.

---

**5.** Indeed, the State suggests that Sweet's sexual abuse of an earlier victim was one factor that ultimately led the victim to kill another person. That young man is currently serving a 30–year sentence for murder.

**6.** The record indicates that Poulin was sentenced to three years in prison and four years of probation in September 1990. Unless his probation was terminated, he remained on probation during the period in question notwithstanding counsel's ambiguous statements to the contrary. Sweet admits that during the time in question, he was on probation.

### 3. Total Length of Sentences

[¶ 22] Finally, both Sweet and Poulin urge the court to conclude that the sentences are simply too long. Once we have determined that each individual step in the Hewey process was correctly applied, we review the sentence in its entirety for abuse of discretion. Because of the difference in final sentence lengths, we address each separately.

### (i) Sweet

[¶ 23] Sweet was sentenced to a total of 40 years in prison. Using current good time calculations, he may be released in approximately 35 years. *See* 17–A M.R.S.A. § 1253 (1983 & Supp.1999). The length of this sentence reflects both the serious nature of Sweet's crimes and his criminal history. Sweet had previously served a ten-year sentence for his earlier sexual activities with children. He was convicted of threatening one of those victims after his release. He was on probation at the time of these new offenses. He was aware of his counseling options and aware of the dire consequences awaiting him should he abuse more children.

[¶ 24] Nonetheless, Sweet sought out and assaulted two more children. The court was justified in concluding that because Sweet was not deterred by his previous sentence or willing to take advantage of the services available to him through probation, the risks he posed to children were grave. Moreover, it was clear that Sweet was not a good candidate for further probation. The court's decision to impose a lengthy unsuspended sentence reflects the sentencing goals of restraining the convicted person in the interest of public safety as well as recognizing the gravity of the offenses. *See* 17–A M.R.S.A. § 1151(1), (8) (1983 & Supp.1999). We conclude that the court did not exceed the bounds of its discretion in sentencing Sweet to 40 years in prison.

### (ii) Poulin

[¶ 25] Poulin was sentenced to a total of 65 years. Assuming that he obtains the benefit of current good time calculations, he will be eligible for release in approximately 54 years. *See* 17–A M.R.S.A. § 1253. This sentence in total is significantly longer than most sentences meted out in Maine. Poulin will not be released until he is into his eighties. It is clear from the discussion at sentencing that the judge intended to prevent Poulin from gaining access to any more children for many years.

[¶ 26] We must determine whether, on the facts of this case, the sentence is simply too long. In particular, we review the court's decision not to suspend any portion of the sentences imposed for abuse of discretion. *See Pfeil*, 1998 ME 245, ¶ 19, 720 A.2d at 578. We do not substitute our judgment for that of the sentencing justice and unless the justice has exceeded the bounds of his discretion or made a positive error of law, we will not disturb the sentence imposed. *See id.*

[¶ 27] Poulin's sentencing was unusual in that the court had before it Poulin's personal journal chronicling in detail his thoughts, desires, and actions relating to the sexual abuse of children. The lengthy journal, which Poulin does not dispute contains his own writings, was written during 1994 and 1995. The charges on which Poulin was sentenced alleged dates of crimes during 1996 and 1997. The journal therefore provided the court with significant and rare insights into the events that led to Poulin's convictions.

[¶ 28] The journal unquestionably played a significant part in the court's decision. It contains a disturbing record of Poulin's efforts and successes in obtaining sex from children. It also sets out Poulin's involvement with N.A.M.B.L.A. and his belief that sexual relationships between adult men and young boys are acceptable no matter what the "moral majority" believes. The journal openly addresses his intention to

ignore the laws criminalizing this behavior and to continue to practice this activity regardless of the possible consequences. During a period of incarceration he wrote a novel of "man/boy love," but threw it away before he was released because "I had heard that they search all your belongings before they let you go." Discussing Sweet, Poulin wrote:

> Richard *was* a boy lover but the years he spent in jail, I believe, scared him away from the practice. His honest desire for boys is greatly suppressed, which is not good. I believe there is no such thing as a "reformed boy lover."
>
> Sooner or later, Richard is going to be attracted to a boy and he's going to cross that line that society and the judicial system has put between men and boys. (Emphasis in original.)

[¶ 29] In a chilling passage, Poulin demonstrated his understanding of the vulnerability of certain boys. "Ahh, the boys of Water Street. They are usually from broken homes or troubled ones at least. Alcohol is almost always a factor. They are despondent and need love .... These are the boys I love." The journal also contains graphic passages of Poulin's sexual activities with several boys and frequently discusses possibilities of new contacts with other boys. As one relationship with a boy came to an end, Poulin wrote: "In the meantime, I must have him introduce me to one of his friends. I have to have another link before the chain falls apart and I have to start anew." It is significant that the journal disclosed Poulin's understanding of when to disclose his penchant for sex with children and when to hide it or to give the "I Look But Don't Touch" speech.

[¶ 30] During the sentencing hearing, the court indicated that it had reviewed both Poulin's journal and his statement submitted in support of sentencing. The court gave particular weight to Poulin's own statement that "there is no such thing as a 'reformed boy lover.'" The court noted that Poulin had inflicted physical pain, through anal intercourse, on one of his victims at the same time that he acknowledged in his journal how much pain he had suffered himself when he was first penetrated anally.

[¶ 31] The court also had before it the victim impact statements gathered by the victim witness advocates regarding the three boys victimized by Poulin's assaults. Those statements spoke volumes about the destruction left in the wake of Poulin's activities. Dr. James Jacobs completed an evaluation of Poulin for sentencing and concluded that Poulin has difficulty understanding the effects of his victimization on the children and that empathy, lacking in Poulin, "is felt to be one component in reducing risk of recidivism." He further opined that Poulin "probably does not have a good prognosis in sexual offender treatment due to the underlying personality disorder components."

[¶ 32] We conclude that the court did not err in determining that Poulin is not a good candidate for probation. Control of his activities could be attempted only through intense supervision and conduct management. Even with such resources in place, resources that are scarce in our current system, Poulin's well-documented ability to fool those around him and still gain access to vulnerable children is amply demonstrated in this record.

[¶ 33] Finally, we conclude that the sentence, although extraordinary in length, is sufficiently supported by the facts in the record that it must be affirmed. We note that a sentence of this length will be appropriate only in the most unusual cases and would not be appropriate in the absence of the multiple aggravating factors present here. Indeed, in his sentencing argument to the court, the prosecutor indicated that on only one prior occasion in a 25–year history had his office recommended a sentence as severe as the one recommended here. In that case, involving a defendant named Elwood Twist, the defendant was sentenced to 85 years (reduced after appeal to 68 years as a

result of a defective indictment) for multiple unrepented acts of sexual assaults on children. *See State v. Twist,* 528 A.2d 1250 (Me.1987).

[¶ 34] Here, the number of victims, the length of time during which the activities continued, the nature of the sexual activities, the dire effects on the victims, the defendant's own statements to the effect that a "boy lover" never changes, and the extremely significant risk of his reoffending upon release have all combined to warrant a sentence of significant length. We cannot say that the sentence structured by the court in this case exceeded the bounds of the court's discretion or reflected any error of law or principle.

The entry is:

The sentence imposed on Richard Sweet is affirmed. The sentence imposed on Paul Poulin is affirmed.

---

**7.** The sentencing judge, in his discussion of whether to impose a sentence in the 20 to 40–year range, mentioned several times that there were multiple victims. I do not agree that a sentence should be placed in the 20 to 40–year range because there are several victims and, in addition, make that sentence consecutive because the offenses were committed on separate victims. The court, however, had sufficient other grounds on which to place the sentence in the 20 to 40–year range and for the imposition of consecutive sentences.

**8.** In my view, both defendants received de facto life sentences. Even if Poulin is able to earn the maximum amount of good time, he cannot be released from prison for 54.75 years which means that he will be in his mid-eighties before release. If Sweet earns the maximum good time, he cannot be released for approximately 35 years which means that he will be in his early eighties before he will be released. Assuming that the average life expectancy of a white male in the United States is in his mid-seventies, the defendants are not expected to live long enough for release. (In 1996 the average life expectancy, adjusted for age, of a white male in the United States was 73.8 years. Center for Disease Control, *Mortality Patterns—Preliminary Data, United States, 1996,* MORBIDITY AND MORTALITY WKLY. REP. (October 10, 1997).)

We have previously refused to define sentences of 65 years (*State v. Wood,* 662 A.2d

CALKINS, J., with whom DANA, J., joins, concurs in part and dissents in part and files opinion.

CALKINS, J., with whom DANA, J., joins, concurring in part and dissenting in part.

[¶ 35] I respectfully dissent to that portion of the opinion affirming Poulin's sentences. I do not fault the manner in which the sentences were imposed. I agree that the heinousness of the commission of the offenses and the prior criminal record were sufficient to warrant sentencing in excess of 20 years.[7] I cannot disagree, at least in the abstract, with the discussion of consecutive sentences.

[¶ 36] I dissent because the totality of Poulin's sentences is excessive.[8] Although a court follows the established sentencing

908, 913 (Me.1995)) and 75 years (*State v. Goodale,* 571 A.2d 228, 229 (Me.1990)) as de facto life sentences, but at the time of the sentences in those cases prisoners were able to earn more substantial reductions to their sentences than Poulin will be able to earn. We noted that Wood would be able to reduce his sentence to 38 years. *See Wood,* 662 A.2d at 913. The Maine Legislature has not sanctioned life sentences for any offense except murder, and we set forth guidelines limiting the situations for which a life sentence should be imposed to those murders with certain aggravating circumstances. *See State v. Shortsleeves,* 580 A.2d 145, 149–50 (Me.1990). We recognized: "[t]he imposition of a life sentence has such a serious impact on the offender so different from the impact of a sentence for a term of years that a life sentence is never justified unless the murder is accompanied by aggravating circumstances." *Id.* at 149 (quoting *State v. Anderson and Sabatino,* Nos. 78–37, 78–40 (Me.App. Div. June 30, 1980)). I am willing to assume, for the time being, that the authority granted by the Legislature for consecutive sentences permits de facto life sentences, but at the very least such sentences must be scrutinized carefully and limited to the most extreme behavior.

Although Sweet's de facto life sentence comes close to the permissible limit, I do not dissent in his case because I do not consider the 40–year total sentence to be illegal or beyond the bounds of permissible discretion.

procedures and principles, a sentence which is excessive will be vacated. *See State v. Frechette,* 645 A.2d 1128, 1129 (Me.1994) (vacating four sentences of 20 years each imposed consecutively). In reviewing the propriety of a sentence, *see* 15 M.R.S.A. § 2155(1) (Supp.1999), excessiveness is considered. *See* Daniel E. Wathen, *Disparity and the Need for Sentencing Guidelines in Maine: A Proposal for Enhanced Appellate Review,* 40 ME. L. REV. 1, 11 n. 32 (1988) (quoting *State v. Carter,* No. AD–76–824 (Me.App.Div. Jan. 2, 1979)).

[¶ 37] A measure of excessiveness is the range of sentences for similar offenses. I am not aware of any gross sexual assault cases, in which the sentences were reviewed by us or the former Appellate Division of the Supreme Judicial Court, where the sentences imposed upon a single defendant approximated the 65 years imposed on Poulin. The longest such sentence I have found in the reported cases is 40 years. *See State v. Lobozzo,* 1998 ME 228, ¶ 6, 719 A.2d 108, 110 (affirming sentences of 40 years on kidnapping and gross sexual assault and lesser sentences on unlawful sexual contact and assault, all to be served concurrently).[9]

[¶ 38] In my view Poulin's sentence of 65 years is outside the reasonable bounds of discretion. The total length of his sentences, combined with the court's refusal to suspend even a few years, is excessive in light of the totality of circumstances, which include, in addition to those mentioned by the sentencing court, Poulin's relatively young age and his age at the release point. I fear that the affirmance

of this sentence will substantially raise the bar of sentences generally.

---

9. The opinion refers to a 68–year sentence imposed upon Elwood Twist for multiple offenses of rape and gross sexual misconduct. We did not review the sentence in his case, and it is not noted in the appeal of his conviction. *See State v. Twist,* 528 A.2d 1250 (Me. 1987). There is much difficulty in ascertaining generally what sentences have been imposed for similar offenses. Except for a case by case search in each of the Superior Court clerks' offices, there is no way to find out what sentences have been imposed. Further-

more, there is the added problem of comparing sentences for offenses committed before October 1, 1995 with offenses committed after that date. *Compare* 17–A M.R.S.A. § 1253(3)-(5) *with* § 1253(8) (Supp.1999). A sentence of 68 years for a pre–1995 offense would result in a release after 39 years whereas the same sentence for a post–1995 offense would result in a release after 58 years in prison, assuming maximum good time credits for both.