2008 ME 5

**STATE of Maine**

v.

**Jon F. DILLEY.**

Supreme Judicial Court of Maine.

Argued: Oct. 24, 2007.
Decided: Jan. 8, 2008.

G. Steven Rowe, Attorney General, Donald W. MacOmber, AAG, Lisa Marchese, AAG (orally), Office of Attorney General, Augusta, ME, for the State.

Steven C. Peterson, Esq. (orally), West Rockport, ME, for the defendant.

Panel: SAUFLEY. C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

SAUFLEY, C.J.

[¶ 1] Jon F. Dilley shot his mother and his wife to death in the presence of his nine-year-old daughter and six-year-old son. Dilley did not deny shooting the two victims. Rather, the pivotal issue at trial was Dilley's state of mind at the time he committed the crimes. Dilley now appeals from judgments of conviction and from his sentences for two counts of manslaughter (Class A), 17–A M.R.S. § 203(1)(A) (2007), entered in the Superior Court (Cumberland County, *Marden, J.*) upon a jury verdict of guilty, arguing that (1) the court erred in admitting testimony regarding a conversation he had with a co-worker two years before the time of the crimes; (2) the court abused its discretion in receiving community impact statements, including one from the Boothbay Region Domestic Abuse Prevention Council, during sentencing; (3) the court abused its discretion in determining the maximum sentence on each count; and (4) the court erred in sentencing Dilley to consecutive thirty-year sentences because the crimes were not separate episodes and were not serious enough to warrant consecutive sentences. We discern no error and affirm the judgments and the sentences.

## I. BACKGROUND

[¶ 2] The jury could reasonably have found the following facts. On August 19, 2004, two days before Dilley killed his wife and mother, Dilley's wife informed him that she was going to move out of their home and into a house in Farmingdale that she was in the process of purchasing with some assistance from Dilley's mother. Dilley was upset, and he felt that his mother was encouraging his wife to leave him.

Dilley was also engaged in a dispute with his mother regarding college costs for his child from an earlier marriage.

[¶ 3] The following night, Dilley's wife had car trouble. Dilley's mother drove over to loan a car to Dilley's wife, and Dilley's wife stayed at a house that she co-owned as an investment with Dilley and his mother. Dilley agreed to meet his wife at that house early the next morning to pick up their two children for the weekend and make sure that his wife's car was towed.

[¶ 4] When Dilley arrived the next morning, his wife asked him to drive to his mother's house to help her return the car she had borrowed. He said he did not want to see his mother because they were not getting along, but he agreed to meet his wife at his mother's home to quickly drop off the borrowed car, with the children staying in his car. Before the children left in Dilley's car, however, their mother, who was pacing, told them that they should ask to use the bathroom when they arrived at their grandmother's house. When they arrived at the home of Dilley's mother, Dilley's son asked to use the bathroom. Everybody went inside.

[¶ 5] Dilley argued with his mother in the living room. He then followed his wife outside and told the children to get into his car. His son got in. Dilley's daughter, however, heard the telephone ring in the kitchen and picked it up. The person on the other end of the line was the owner of the towing company that Dilley's wife had called. He had worked for the police in the past and had pulled over in the parking lot of the police station to call and find out where Dilley's wife had left her car. Dilley's daughter said that her mother was busy and asked the caller to hold on.

[¶ 6] Meanwhile, Dilley and his wife were arguing outside. Dilley's wife tried to get her son out of the car, but Dilley

blocked her way by opening the car door between them. Dilley's mother said, from the doorway of the house, that she was going to call the police, and Dilley told his wife that *he* was the one who should call the police. His wife told him to go ahead and asked him whom he thought the police would believe. Dilley's wife signaled to their son to exit the car using the opposite door, which he did.

[¶ 7] Dilley then walked over to his trunk, opened it, and removed a pistol from a bag in the trunk that contained two firearms. His son ran inside, followed by Dilley's wife. Dilley's wife locked the door behind her, dropped to the floor, and covered her head.

[¶ 8] Dilley shot at the locked door to break the glass. He entered the house, found his wife in the living room, and shot her multiple times. Dilley's daughter held her brother back. Dilley's mother ran outside to try to get in her car. Dilley went after her and shot her just outside the house. He then went back in the house and began shooting at his wife again.

[¶ 9] The children ran outside and found adults who took them to the nearby Coast Guard station. Dilley went outside and returned the gun to the trunk. He then returned to the house.

[¶ 10] When a police officer and the tow truck operator who had called arrived at the scene, they saw Dilley come out through the shattered door. They yelled for him to drop to the ground. Dilley put down his keys and a water bottle and got on the ground. The officer kept his gun aimed at Dilley while the tow truck operator put handcuffs on him. Dilley appeared calm and quiet, but he would not identify himself. He did state that he had shot his mother and his wife. The officer examined the bodies and confirmed that both women were dead.

[¶ 11] Dilley was charged by indictment with two counts of intentional or knowing murder, 17–A M.R.S. § 201(1)(A) (2007). After pleading not guilty, Dilley proceeded to trial.

[¶ 12] The trial took place over six days. At one point, the State offered the testimony of a man who had worked under Dilley's supervision in December 2002. After the State conducted a voir dire examination of the witness, Dilley objected that the evidence was irrelevant and unfairly prejudicial pursuant to M.R. Evid. 401 and 403. The court overruled Dilley's objections and permitted the witness to testify about a conversation he had had with Dilley concerning a news story that involved a husband shooting his wife and killing himself. The witness testified that Dilley had "told [the witness] he could understand why a husband would kill his wife, that his wife was nothing but a bag of hormones that was regulated by her monthly cycle." The witness said that Dilley's demeanor when he made the statement was angry and tense, and that he made the statement with strong conviction.

[¶ 13] On cross-examination, Dilley elicited testimony that the witness did not like Dilley because Dilley had laid him off from work. Dilley also testified that he had let this employee go because he had done a poor job and had left the job site without authorization. In his own testimony on this point, Dilley conceded that he may have discussed the news story because he knew the man involved, that he may have expressed sympathy regarding the difficulties the family had experienced, and that his wife was, in fact, "hormonal," which he knew because they had used the "rhythm method" of birth control.

[¶ 14] To challenge the State's charge that he had intentionally or knowingly killed his wife or his mother, Dilley offered the testimony of a psychologist from the

State Forensic Service. Based on her psychological examination of Dilley, she concluded that Dilley had experienced a dissociative state called depersonalization. She testified that the episode of depersonalization began when Dilley and his wife argued about calling the police and ended when he was standing over his wife's body. The psychologist testified that Dilley's cognitive functions had split off because of the stressful situation, Dilley's emotional agitation, and his sense of vulnerability. Specifically, Dilley's peripheral vision had been impaired, his movements had become mechanical, and he had felt like he was moving through water. The psychologist also testified that, although a sense of reality is maintained when experiencing this condition, the experience is more like a dream state or like seeing oneself acting from the outside.

[¶ 15] Another psychologist who examined Dilley also concluded that Dilley had experienced depersonalization. This psychologist, however, concluded that the depersonalization began while Dilley was on his way to the trunk of his car and ended sometime after he refused to give the officer his name.

[¶ 16] After the close of evidence, the court instructed the jury on intentional or knowing murder and the lesser-included offense of manslaughter. The jury found Dilley guilty of two counts of manslaughter. Dilley unsuccessfully moved for a judgment of acquittal, pursuant to M.R.Crim. P. 29, on the ground that if the jury believed he was depersonalized—his only defense—the jury should have found him not guilty rather than convicting him of manslaughter.

[¶ 17] Before sentencing Dilley, the court accepted a presentence investigation report that included a partial police report and victim and community impact statements, among other attachments. One of

the community impact statements came from the Boothbay Region Domestic Abuse Prevention Council. The Council stated that the killings of Dilley's wife and mother highlighted the need to educate the community regarding domestic violence issues. The Council also discussed a perceived fear and frustration of the Boothbay Harbor community. Although Dilley moved the court to exclude the Council's statement, among others, the court accepted all offered statements. In addition to accepting written statements, the court held a hearing at which several individuals who knew the victims or Dilley made statements, and at which Dilley himself provided a statement.

[¶ 18] The court set the basic sentence for each crime at twenty-five to thirty years based on a step-by-step recitation of Dilley's conduct in committing the crimes. Although the court acknowledged that Dilley was guilty of manslaughter, not murder, the court concluded that this did not affect the seriousness of the conduct itself. The court concluded that the seriousness of the crime placed it in the range of twenty-five to thirty years.

[¶ 19] The court then considered the aggravating and mitigating factors. The court found as mitigating factors that Dilley was a good worker, he is an intelligent man, he is free of significant criminal history, and he was attentive in his way to his family responsibilities. As aggravating factors, the court found that Dilley was self-centered and oppressively obsessed with controlling others; he was very cavalier about the use of firearms; he was devoid of familial emotion and respect such that he could not be understood to communicate love; he was in a state of depression, which was one factor that triggered the episode; he was aware of his conduct, even in his depersonalized state; his children witnessed and were proximate to the

death of their mother and grandmother; the community lost a respected neighbor and popular teacher in Dilley's wife; his wife had a sense of foreboding before the crime was committed; Dilley poses a risk if released because of his depression and obsessively controlling tendencies and the unpredictability of whether he will be able to handle stress in the future; and Dilley continues to point out the victims' flaws as a partial explanation. Based on its weighing of these factors, the court set a maximum sentence of thirty years.

[¶ 20] The court determined that probation would not be appropriate because the many factors involved in this case would be "particularly unmanageable for a probation officer." The court also stated that, based on Dilley's age, it did not consider probation to be appropriate.

[¶ 21] Finally, the court considered whether to impose consecutive sentences. The court determined that there were two separate criminal episodes involving two different victims:

> These were two different persons with two different personalities. Two different relationships with Mr. Dilley. Whatever motivation, whatever created the drive in him to commit these offenses were two separate—two separate occasions because they had to be. They had to be different persons with different relationships. So the Court is satisfied that this was two different transactions. It was two episodes. He could have stopped with his wife, could have stopped with his mother, and he deliberately as near as can be determined under the circumstances I've described went from one to the other and they were physically separate.

Taking into account the seriousness of the criminal conduct and the manner in which the crimes were committed, the court concluded that Dilley's was "that rare case when it is appropriate under the law to impose consecutive sentences." Accordingly, the court sentenced Dilley to consecutive thirty-year sentences for the two crimes. The court also ordered Dilley to pay $50 in assessments.

[¶ 22] Dilley timely appealed from the conviction and obtained leave to appeal from his sentences.

## II. DISCUSSION

[¶ 23] We begin by reviewing Dilley's contention that his convictions should be vacated.

### A. Admission of Dilley's Statements to his Co-worker

[¶ 24] Dilley argues that the court erred in admitting his co-worker's testimony because it was not relevant and any probative value was outweighed by the risk of unfair prejudice. He contends that the statement did not include any threat against his wife and that this evidence may have contributed to the jury's decision to convict Dilley of manslaughter despite the evidence of depersonalization.

[¶ 25] We review a trial court's determination of relevance for clear error. *State v. Buchanan,* 2007 ME 58, ¶ 8, 921 A.2d 159, 162. This standard of review " 'is similar to a sufficiency of the evidence standard in that it asks if the trial court's ruling on evidentiary foundation is supported by or not inconsistent with the facts that appear in the record.' " *Id* (quoting Alexander, *Maine Appellate Practice* § 405(e) at 186 (2005)). We review a trial court's weighing of the probative value of evidence against the risk of unfair prejudice for an abuse of discretion. *See State v. Hamel,* 2007 ME 18, ¶ 6, 913 A.2d 1287, 1289.

[¶ 26] The Maine Rules of Evidence generally permit the admission of relevant

evidence: "All relevant evidence is admissible, except as limited by constitutional requirements or as otherwise provided by statute or by these rules or by other rules applicable in the courts of this state. Evidence which is not relevant is not admissible." M.R. Evid. 402. Rule 401 of the Maine Rules of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[¶ 27] Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." M.R. Evid. 403. This rule is designed to prevent a tribunal from deciding a case on "an improper basis, commonly, though not always, an emotional one." *State v. Ardolino*, 1997 ME 141, ¶ 10, 697 A.2d 73, 78 (quotation marks omitted).

[¶ 28] To determine whether evidence is relevant, a court must examine the elements of the crimes charged. Here, Dilley was charged with knowing or intentional murder and the lesser included offense of manslaughter. A person is guilty of knowing or intentional murder if he or she "[i]ntentionally or knowingly causes the death of another human being." 17–A M.R.S. § 201(1)(A). A person is guilty of the lesser included offense of manslaughter if he or she "[r]ecklessly, or with criminal negligence, causes the death of another human being." 17–A M.R.S. § 203(1)(A).

[¶ 29] The Maine Criminal Code in effect at the time of the crimes defined the states of mind required to prove knowing or intentional murder or manslaughter:

1. "Intentionally."

A. A person acts intentionally with respect to a result of his conduct when it is his conscious object to cause such a result.

B. A person acts intentionally with respect to attendant circumstances when he is aware of the existence of such circumstances or believes that they exist.

2. "Knowingly."

A. A person acts knowingly with respect to a result of his conduct when he is aware that it is practically certain that his conduct will cause such a result.

B. A person acts knowingly with respect to attendant circumstances when he is aware that such circumstances exist.

3. "Recklessly."

A. A person acts recklessly with respect to a result of his conduct when he consciously disregards a risk that his conduct will cause such a result.

B. A person acts recklessly with respect to attendant circumstances when he consciously disregards a risk that such circumstances exist.

C. For purposes of this subsection, the disregard of the risk, when viewed in light of the nature and purpose of the person's conduct and the circumstances known to him, must involve a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation.

4. "Criminal negligence."

A. A person acts with criminal negligence with respect to a result of his conduct when he fails to be aware of a risk that his conduct will cause such a result.

B. A person acts with criminal negligence with respect to attendant circumstances when he fails to be aware of a risk that such circumstances exist.

C. For purposes of this subsection, the failure to be aware of the risk, when viewed in light of the nature and purpose of the person's conduct and the circumstances known to him, must involve a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation.

17–AM.R.S. § 35(2006).[1]

■ [¶ 30] In criminal trials involving an intent element, we have repeatedly held that evidence of the prior relationship between the accused and the victim is relevant and admissible to establish the accused's motive, intent, or opportunity to commit the crime, or to demonstrate the absence of any mistake or accident. *See State v. Roman,* 622 A.2d 96, 98–99 (Me. 1993); *State v. Young,* 560 A.2d 1095, 1096 (Me.1989); *State v. Lewisohn,* 379 A.2d 1192, 1201 (Me.1977). If the evidence regarding the accused's relationship to the victim concerns events that arose a significant amount of time before the crime, that remoteness in time generally goes to the weight, not the admissibility, of the evidence. *See State v. Winslow,* 571 A.2d 1198, 1201 (Me.1990) ("Remoteness in time of threats goes to the weight and not the competency of the evidence."); *State v. Ledger,* 444 A.2d 404, 414–15 (Me.1982) (stating that evidence of prior hostilities is admissible even when remote in time because it is relevant to intent); *see also State v. Doyon,* 221 A.2d 827, 829 (Me. 1966) (citing to numerous cases in which courts of other jurisdictions admitted evidence of threats made even several years before the charged criminal conduct).

[¶ 31] Based on the evidence presented, the court did not err in determining that Dilley's conversation with his fellow employee was relevant to the charged crimes. Dilley's statements to the State's witness were relevant to Dilley's state of mind and intent—two crucial issues in Dilley's trial. Dilley was afforded the opportunity to impeach the witness through cross-examination, and the jury was properly left to assess the witness's credibility and weigh the importance of this evidence in light of the undisputed testimony that the conversation occurred about two years before the alleged criminal conduct.

■ [¶ 32] Similarly, the court did not abuse its discretion in admitting the evidence over Dilley's Rule 403 objection. Although there was some risk of prejudice, the risk was not unfair. Dilley had the opportunity to cross-examine the witness and to testify on his own behalf about the witness's dislike of Dilley due to the termination of his employment. The submission of this evidence to the jury cannot be regarded as an abuse of discretion.

[¶ 33] Accordingly, we affirm the court's judgments of conviction entered upon the jury's verdict finding Dilley guilty of two counts of manslaughter. We next consider whether the court erred in sentencing Dilley.

B. Sentencing Review

[¶ 34] Dilley makes three arguments regarding the sentences imposed on him: (1) that the court abused its discretion in considering community impact statements, including that of the Boothbay Region Domestic Abuse Prevention Council; (2) that the court abused its discretion in determining the maximum sentence for each conviction because he had depersonalized when he shot his wife and his mother; and (3) that the court erred in imposing consecutive sentences.

1. This statute has since been amended to make the language gender neutral. P.L.2007, ch. 173, § 8 (effective Sept. 20, 2007) (codified at 17–A M.R.S. § 35 (2007)).

[¶ 35] Without further discussion, we conclude that (1) the court acted well within its discretion in considering the community impact statements, *see* 17–A M.R.S. § 1174(3) (2007), and (2) the evidence of depersonalization did not render the court's determination of a thirty-year maximum period of incarceration an abuse of discretion, *see State v. Sweet*, 2000 ME 14, ¶ 15, 745 A.2d 368, 372–73; *State v. Prewara*, 687 A.2d 951, 953 (Me.1996).

[¶ 36] Regarding Dilley's final argument, we conclude that the court did not abuse its discretion in imposing consecutive sentences pursuant to 17–A M.R.S. § 1256 (2007). *See Sweet*, 2000 ME 14, ¶ 15, 745 A.2d at 373; *Prewara*, 687 A.2d at 954–55. Dilley shot and killed his children's mother and grandmother in front of them. He shot through the door to reach his wife, killing her as she lay cowering on the floor. He then ceased shooting at her, turned, sought out his mother, chased her into the yard, and killed her as she ran from him, after which he returned to the house and shot his wife again. The court was justified in determining that the extraordinarily serious nature of his conduct warranted consecutive sentences. *See* 17–A M.R.S. § 1256(2)(D).

[¶ 37] Accordingly, in addition to affirming Dilley's convictions, we affirm his consecutive thirty-year sentences.

The entry is:

Judgments and sentences affirmed.