MAINE SUPREME JUDICIAL COURT                        Reporter of Decisions
Decision:      2019 ME 82
Docket:        SRP-17-364
Argued:        September 12, 2018
Decided:       May 30, 2019

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

# STATE OF MAINE

v.

# ANTHONY LORD

SAUFLEY, C.J.

[¶1]  In July 2015, Anthony Lord went on a multi-hour, violent rampage through Aroostook and Penobscot Counties.  By the time the police arrested him, Lord had killed two people and severely injured several others.  He eventually pleaded guilty to two murders, *see* 17-A M.R.S. § 201(1)(A) (2018), and a dozen other crimes.  At sentencing, the court (Penobscot and Aroostook Counties, *A. Murray, J.*) imposed a life sentence for each of the two murders and concurrent sentences of various terms of years for the other crimes.  The Sentence Review Panel accepted Lord's petition to appeal from the life sentences, bringing this matter before us.  *State v. Lord*, No. SRP-17-364 (Me. Sent. Rev. Panel Nov. 8, 2017); *see* 15 M.R.S. §§ 2151-53 (2018); M.R. App. P. 19.

[¶2]  Lord argues that the court erred in entering the two life sentences because, in setting the basic sentences, the court improperly considered the other crimes that he committed during those fateful hours.  Lord also argues that the court improperly "double-counted" his criminal history by considering it both (1) in determining the basic sentence and (2) as an aggravating factor when determining his maximum sentence.  We affirm the sentences entered by the court.

## I.  BACKGROUND

### A.    Factual History

[¶3]  The following facts are drawn from the State's summary of the evidence that it would have presented had Lord not pleaded guilty and had the matter gone to trial.  *See* M.R.U. Crim. P. 11(b)(3), (e).  Although Lord disputed or corrected certain of the details in the State's representations, he does not dispute the evidentiary support for any of the following facts.

[¶4]  In July 2015, Anthony Lord was thirty-five years old.  Two months prior to the events in issue, his six-month-old son had died as a result of what Lord considered to be the intentional act of another man.  Also prior to the events in issue, Lord's former girlfriend had reported criminal conduct by Lord toward her.

[¶5]  Sometime before 8:30 p.m. on July 16, 2015, Lord set fire to a barn on property owned by that young woman's mother in Aroostook County.  The mother, who suffers from multiple sclerosis, was alerted to the fire by a neighbor, after which the mother called her daughter.  As the fire was raging, the young woman arrived with the man she was then dating, and they stayed with her mother after the fire department left.  The fire burned intensely, eventually leveling the barn.

[¶6]  Hours later, at approximately 4:00 a.m., Lord knocked on the door of a friend's uncle, who lived in Aroostook County.  He told the uncle that the car he was driving was out of gas and had broken down.  When the uncle came outside, Lord hit him in the head with a hammer, ordered him inside, took two guns—a shotgun and a .22 caliber revolver—and ammunition, and barricaded the uncle in the basement of the house.  Lord next drove to the residence of his own brother and fired through the window with the revolver.  His brother was at home but was not injured.

[¶7]  Lord then went back to the property of the young woman's mother.  Arriving at the home after all of the fire responders had left, Lord used the revolver he had stolen to shoot through the door of the mother's home, wounding his former girlfriend in the arm.  He then entered the home and shot

eight bullets into the neck, chest, and pelvis of her boyfriend, who, after attempting to talk with his own mother by phone one last time, later died of his wounds.  The young woman ran to the bathroom where her mother helped her escape through the window.  Lord shot her mother in the shoulder, the young woman successfully escaped, and Lord reloaded his gun and exited the house.

[¶8]  As the young woman fled, jumping into the bed of a passing truck, Lord came after her and jumped into the truck bed with her.  When the driver responded to their unexpected presence in the truck bed and pulled into a nearby driveway, Lord shot him three times in the neck and upper back using the revolver.  Both the young woman and Lord leapt out of the truck at that point.  The driver survived his injuries.

[¶9]  In a pickup truck stolen from his friend's uncle, Lord drove toward the Penobscot area with the young woman in the truck.  Police found and pursued the truck, and Lord shot at oncoming traffic and at law enforcement officers.  Lord eventually drove to a woodlot where he encountered two men who had just dropped off a load of wood.  He did not know either of those men. Lord asked for a cigarette and a phone and then aimed the revolver at one of the men, who said, "No, no, no man."  The man tried to run away, but Lord shot

directly at him and killed him. As the other man turned to run, Lord fired and hit the man once; he survived.

[¶10] With the young woman still with him, Lord returned to Aroostook County in a truck owned by one of the men he had shot; broke into a number of different camps and residences; and stole a four-wheeler, another firearm, and other items. He was finally arrested after meeting with a family member.

B.    Procedural History

[¶11] The procedural history is not in dispute. In July 2015, the State filed two complaints charging Anthony Lord with murder, 17-A M.R.S. § 201(1)(A), and kidnapping (Class B), 17-A M.R.S. § 301(1)(B)(1) (2018), in Aroostook County and murder, 17-A M.R.S. § 201(1)(A), in Penobscot County. In August and September, Lord was charged by indictments filed in each county with those crimes and multiple others.[1]

---

[1] The charges included:

- Two counts of attempted murder with a firearm (Class A), 17-A M.R.S. §§ 201(1)(A), 1158-A(1)(B), 1252(5) (2018);

- Arson (Class A), 17-A M.R.S. § 802(1)(A) (2018);

- Elevated aggravated assault with the use of a dangerous weapon (Class A), 17-A M.R.S. §§ 208-B(1)(A), 1158-A(1)(B), 1252(5) (2018);

- Three counts of aggravated assault with the use of a dangerous weapon (Class B), 17-A M.R.S. §§ 208(1)(B), 1158-A(1)(B), 1252(5) (2018);

[¶12]  Lord initially pleaded not guilty to all charges.  In late 2016, he moved to suppress evidence obtained during a police interview of him.[2]  In June 2017, after finding Lord competent to stand trial,  the court held an evidentiary hearing on Lord's motion to suppress, receiving in evidence a recording of the police interview.

- Two counts of theft by unauthorized taking of a firearm (Class B), 17-A M.R.S. § 353(1)(B)(2) (2018);

- Four counts of reckless conduct with the use of a dangerous weapon (Class C), 17-A M.R.S. §§ 211(1), 1158-A(1)(B), 1252(4), (5) (2018); and

- Eluding an officer (Class C), 29-A M.R.S. § 2414(3) (2018).

[2] Months passed between the filing of the indictment and the filing of the motion to suppress due to a motion for a mental examination and resulting report filed in 2016; the withdrawal of defense counsel and assignment of new counsel in 2016; and discovery motions filed in 2015 and 2016.

[¶13]  Before the court could rule on the motion to suppress, Lord decided to plead guilty to the two murder charges and twelve of the other charged crimes,[3] and the State agreed to dismiss the three remaining charges.[4]

C.    The Guilty Pleas

[¶14]  The court held a hearing in July 2017 at which it accepted Lord's guilty pleas.  The court heard the State's summary of the factual basis for the charges, and it thoroughly and carefully followed the requirements of M.R.U. Crim. P. 11 to ensure that the plea was made knowingly and voluntarily.  *See* M.R.U. Crim. P. 11(b)-(e).

---

[3] Lord pleaded guilty to the two murder charges and the following other crimes:

- Two counts of attempted murder with a firearm (Class A), 17-A M.R.S. §§ 201(1)(A), 1158-A(1)(B), 1252(5);

- Arson (Class A), 17-A M.R.S. § 802(1)(A);

- Elevated aggravated assault with the use of a dangerous weapon (Class A), 17-A M.R.S. §§ 208-B(1)(A), 1158-A(1)(B), 1252(5);

- Three counts of aggravated assault with a dangerous weapon (Class B), 17-A M.R.S. §§ 208(1)(B), 1158-A(1)(B), 1252(5);

- Two counts of theft of a firearm (Class B), 17-A M.R.S. § 353(1)(B)(2);

- Two counts of reckless conduct with the use of a dangerous weapon (Class C), 17-A M.R.S. §§ 211(1), 1158-A(1)(B), 1252(4), (5); and

- Eluding an officer (Class C), 29-A M.R.S. § 2414(3).

[4] The State agreed to the dismissal of the charge of kidnapping (Class B), 17-A M.R.S. § 301(1)(B)(1) (2018), and two charges of reckless conduct with a dangerous weapon (Class C), 17-A M.R.S. §§ 211(1), 1158-A(1)(B), 1252(4), (5).

[¶15]  After the State presented its summary of the available evidence, the court afforded Lord the opportunity to correct the facts, and he corrected or clarified certain details but did not dispute that he had committed any of the crimes described.  He did agree that there was a factual basis for each charge.  *See* M.R.U. Crim. P. 11(b)(3), (e).  The court then reviewed the details of the major crimes with Lord and allowed him finally to clarify any discrepancies.  There is no question from the record that Lord understood all of the State's evidence against him and that, once clarified, he agreed with the State's recitation.  It was ultimately clear that Lord chose of his own volition to enter the guilty pleas.[5]  He does not challenge that process or the court's acceptance of his pleas of guilty.

D.    The Sentencing Hearing

[¶16]  The court held a sentencing hearing two weeks later.  Lord and the State agreed that the court could consider the video recording of the July 17, 2015, police interview of Lord that had earlier been admitted at the suppression hearing.  The State summarized the facts of the horrifying and lethal criminal activity in which Lord had engaged and argued for a basic and

---

[5]  Defense counsel also took pains to make the record clear that the choice to plead guilty was entirely Lord's.  He represented that he and co-counsel had not pressured Lord, and they had been prepared to try the case.

maximum sentence of life imprisonment for each of the murders. In support of its recommendation of basic sentences of life imprisonment, the State argued that Lord had in fact premeditated at least one of the killings; had intentionally caused multiple deaths; had used a firearm, which, as a felon, he was prohibited from possessing; had killed the first murder victim in what should have been the safety of a residence; and had killed the second murder victim as a random act of violence. The State further argued for the maximum sentence of life imprisonment because, despite the mitigating factor of Lord accepting responsibility for the murders, his actions had a devastating impact on the victims and their families; he had not been under the influence of any substance and was aware of what he was doing; he had multiple prior convictions, including assault and unlawful sexual contact; and he had violated the terms of his probation by possessing a firearm.

[¶17] The State presented victim impact statements from the young woman who was the object of Lord's pursuit, her mother, the driver whom Lord shot from the truck bed, and family members of those killed or injured by Lord.

[¶18] Lord addressed the court, the victims, and their families and apologized for his actions. Lord, his mother, and a number of Lord's relatives each testified that he suffered from mental illness and that he had been losing

control since his six-month-old son died.[6]  Lord acknowledged that his sentence should exceed the minimum sentence but asked that there be some "daylight at the end."  Lord reasoned that a term of forty years would be a just sentence under the circumstances because he went peacefully into police custody following the rampage, confessed to police truthfully, and had shown remorse since the events at issue.

E.    The Sentence

[¶19]  The court considered the information offered at the sentencing hearing, including the video of the police interview and the summary of the evidence from the Rule 11 hearing, in determining Lord's sentence.  In setting the basic sentence, the court considered the crimes "in the context of the entire course of Mr. Lord's conduct," including his burning of the barn; his assault and barricading of his friend's uncle; the shots he fired into his brother's home; the shootings and murder at the residence of his former girlfriend's mother; his pursuit of that young woman into the bed of a passing truck; his shooting of the truck's driver; the shots he fired at police officers and other vehicles; his shooting of the two men in the woodlot, causing the death of one of them; and

---

[6] As mentioned earlier, Lord believed that his infant son had been murdered.

his theft of vehicles and of firearms, which, as a convicted felon, he was not allowed to possess. *See* 17-A M.R.S. § 1252-C(1) (2018).

[¶20] In determining the basic sentence, the court found two aggravating considerations that made it appropriate to set a basic sentence of life imprisonment: (1) Lord intended multiple deaths and (2) the deaths occurred during a criminal rampage that included numerous acts of violence by a felon who committed arson and stole motor vehicles and guns. The court found that Lord had engaged in the most serious means of committing murder and did not find other cases with similar facts. It ultimately concluded that a basic sentence of life in prison was warranted.

[¶21] The court then considered the aggravating and mitigating factors separate from the means of committing the crime to determine the maximum sentence. *See* 17-A M.R.S. § 1252-C(2) (2018). The aggravating factors identified were the conscious suffering of the young woman's boyfriend before he died; the awareness on the part of the man who died in the woodlot that Lord was about to shoot him; the devastating effect on the victims' families; and Lord's criminal history going back to 1999, including an assault and unlawful sexual contact in 2005 and, most recently, a domestic violence assault in 2015, for which he was on probation at the time of the murders. The court also

considered that he went on this rampage despite having support from family and friends. The mitigating factors were Lord's post-traumatic stress after the death of his son, the mutual love between Lord and members of his family, and his acceptance of responsibility and expressions of remorse.

[¶22] Concluding that the aggravating factors outweighed the mitigating factors, the court entered a judgment of conviction and sentenced Lord to two concurrent life sentences for the murders. The court also sentenced Lord on the remaining convictions, with all to be served concurrently:

- Twenty years each for
    - Two counts of attempted murder with use of a firearm,
    - Elevated aggravated assault with use of a dangerous weapon, and
    - Aggravated assault with use of a dangerous weapon;

- Fifteen years for arson;

- Seven years each for
    - Two counts of aggravated assault with use of a dangerous weapon, and
    - Two counts of theft of a firearm; and

- Five years each for
    - Two counts of reckless conduct with use of a dangerous weapon, and
    - Eluding an officer.

Given the life sentences and Lord's demonstrated lack of success with probation, the court did not suspend any portion of the sentences that were for a term of years or order any probation. *See* 17-A M.R.S. § 1252-C(3) (2018).

The court ordered Lord to pay court fines of $490 and restitution of $38,046.75 to reimburse the Victims' Compensation Fund for amounts paid to the victims' families.[7] *See* 17-A M.R.S. § 1301 (2018).

[¶23] Lord applied to the Sentence Review Panel seeking to appeal from his sentence, and the Panel granted his application. *State v. Lord*, No. SRP-17-364 (Me. Sent. Rev. Panel Nov. 8, 2017); *see* 15 M.R.S. §§ 2151-53; M.R. App. P. 19. He focuses his appeal entirely on the life sentences imposed on the murder convictions.

## II. DISCUSSION

### A. Two-Step Sentencing Procedure for a Murder Conviction

[¶24] When a defendant is to be sentenced for murder, the court employs a two-step process. *See* 17-A M.R.S. § 1252-C (2018) (setting out the three-step procedure for establishing sentences); 17-A M.R.S. § 1201(1)(A) (2018) (providing that a person sentenced for murder may not be considered for a period of probation, thus eliminating the third step of the sentencing process); *State v. Hayden*, 2014 ME 31, ¶ 17, 86 A.3d 1221. "In the first step, the court

---

[7] At the sentencing hearing, the court ordered Lord to reimburse the Victim's Compensation Fund $38,046.75, but the court's judgment and commitment ordered Lord to pay $600 more, totaling $38,646.75. It is likely a typographical error. Although Lord does not raise this issue on appeal, the docket should be corrected to be consistent with the court's oral order to reflect the ordered restitution of $38,046.75.

14

determines the basic period of incarceration, and in the second, the maximum period of incarceration." *Hayden*, 2014 ME 31, ¶ 17, 86 A.3d 1221. On a discretionary appeal from a sentence, we review the "'determination of the basic sentence de novo for misapplication of legal principles and [the] determination of the maximum sentence for abuse of discretion.'" *Id.* (quoting *State v. Waterman*, 2010 ME 45, ¶ 42, 995 A.2d 243).

1.    Step One

[¶25]  In order to determine the basic sentence for any crime, the sentencing court must first identify the range within which a lawful sentence may be imposed for the crime at issue. *See State v. Sweet*, 2000 ME 14, ¶ 11 n.3, 745 A.2d 368 (holding that in step one, the sentencing court must be aware of factors that would either increase or decrease the class of the crime). When the conviction is for murder, the basic sentence range is as follows: "imprisonment for life or for any term of years that is not less than 25." 17-A M.R.S. § 1251(1) (2018).

[¶26]  "Imprisonment for life"—a lifetime in prison, with no potential for release—is inherently different than a sentence for a term of years even when the term of years is lengthy. *See, e.g., Sweet*, 2000 ME 14, ¶ 8, 745 A.2d 368 (affirming the imposition of a sixty-five year sentence and a forty-year sentence

for individuals aged thirty-two and forty-seven, respectively); *see also State v. Shortsleeves*, 580 A.2d 145, 149 (Me. 1990). Even when a defendant is sentenced to a long term of years, the defendant may accumulate good time and other credits and may eventually be released from prison, sometimes earlier than the ordered term of years. *See generally* 17-A M.R.S. § 1253 (2018). A life sentence provides no such option. An individual sentenced to imprisonment for life will never be released. Accordingly, it is necessary for a sentencing court setting the basic sentence to distinguish between a potential life sentence and a sentence for a term of years as the potential longest sentence. *See Hayden*, 2014 ME 31, ¶ 18, 86 A.3d 1221.

[¶27] If a court is considering imposing a *life sentence* for murder, the court must consider—in the first step of the section 1252-C analysis—whether there are "aggravating circumstances" relating to the nature and seriousness of the murder. *Shortsleeves*, 580 A.2d at 150; *see* 17-A M.R.S. § 1252-C(1). In contrast, when considering a *term of years*, the court must address the nature and seriousness of the offense, but it will ordinarily defer concepts of aggravation to the second phase of the analysis. *See Shortsleeves*, 580 A.2d at 149-50.

[¶28]   The "aggravating circumstances" applicable at the first stage require the court to consider whether the murder was committed in a way that included any number of circumstances from which society would expect that the murderer will never return to freedom.  *Id.*  The aggravating circumstances were first addressed in *State v. Anderson and Sabatino*, No. 78-37, 78-40 at 7-8 (Me. App. Div. 1980), and later summarized in *Shortsleeves*, 580 A.2d at 149-50.

[¶29]  The list contained in *Shortsleeves*, however, is "'neither exhaustive nor all-inclusive.'"[8]   *Hayden*, 2014 ME 31, ¶ 18, 86 A.3d 1221 (quoting *Waterman*, 2010 ME 45, ¶ 44, 995 A.2d 243).   Since *Shortsleeves*, we have affirmed the imposition of sentences where, in setting the basic sentence, the sentencing court considered aggravating circumstances that we did not enumerate in *Shortsleeves*.  *See, e.g., State v. Downs*, 2009 ME 3, ¶ 20, 962 A.2d 950 (affirming the court's consideration in step one of the fact that the foundational crime was part of a spree of crimes committed, reasoning that this fact bore "on the nature and seriousness of the crime"); *cf. Sweet*, 2000 ME 14, ¶ 17, 745 A.2d 368 (affirming the court's consideration in step one of the

---

[8] The aggravating circumstances listed in *Shortsleeves* are: premeditation-in-fact; multiple deaths; murder involving a person who has been previously convicted of a homicide or a crime involving the use of deadly force; murder accompanied by torture, sexual abuse, or extreme cruelty to the victim; murder committed in a penal institution by an inmate of that institution; murder of a law enforcement officer while in performance of his or her duties; and murder of a hostage. *State v. Shortsleeves*, 580 A.2d 145, 149-50 (Me. 1990).

offenders' criminal history). Accordingly, because the intentional or knowing taking of a human life will rarely occur in an otherwise neutral setting, and the range of human behavior and decisions that lead to murder are complex, the potentially aggravating circumstances that may justify a life sentence will be equally diverse. Thus, the so-called "*Shortsleeves*" framework is intended to be used as a "guide to distinguish between the two types of sentences," *Hayden*, 2014 ME 31, ¶ 18, 86 A.3d 1221, and it "provides a framework for the potential identification of other [circumstances] that could warrant the imposition of a life sentence," *Waterman*, 2010 ME 45, ¶ 44, 995 A.2d 243. *See generally Sweet*, 2000 ME 14, ¶ 11, 745 A.2d 368.

[¶30] Ultimately, in order to promote public understanding of sentencing decisions and, where appropriate, to allow appellate review of the sentence, the role of the sentencing court in the first step of sentencing a defendant for murder is to identify with clarity any aggravating circumstance found to exist in a case where the court intends to consider imposing a sentence of life in prison. As is noted below, the court in the matter before us did just that.

2.    Step Two

[¶31]  After establishing the basic sentence, the court must determine "the maximum period of imprisonment to be imposed by considering all other relevant sentencing factors, both aggravating and mitigating, appropriate to that case."  17-A M.R.S. § 1252-C(2).  "These sentencing factors include, but are not limited to, the character of the offender and the offender's criminal history, the effect of the offense on the victim and the protection of the public interest." *Id.*  When the crime at issue is murder, conduct leading to contemporaneous convictions that may have been identified in the first step as aggravating circumstances may be separately addressed for their *subjective* victim impact in the second step.  *See Downs*, 2009 ME 3, ¶ 20, 962 A.2d 950.

[¶32]  In essence, because the facts surrounding a conviction for murder do not sort neatly into separately identifiable characteristics, there will inevitably be times when an "aggravating" *Shortsleeves* circumstance will be considered in both the imposition of a life sentence in step one of a murder sentencing analysis and as an aggravating factor that must be addressed in step two.  However, the way in which the court considers the fact will be distinct at the two steps.

B.      Review of Lord's Sentences

1.      Step One Application

[¶33]    The court's sentencing analysis here demonstrates that it understood the framework in which the sentences must be calculated, and it correctly identified the requirement that at least one aggravating circumstance must be present in order to establish the outer sentence as a life sentence in step one.  In addressing the facts constituting those aggravating circumstances, the court noted the presence of one of the *Shortsleeve* circumstances—multiple deaths—as well as the presence of other facts not explicitly identified in *Shortsleeves*—that the murders were part of a crime spree and that Lord used a firearm in the commission of many of these crimes, which, as a convicted felon, he was prohibited from possessing.  The court graphically described Lord's conduct as a series of potentially fatal and persistently violent acts that left two people dead and three others injured:

> As a result of [Lord's] criminal rampage, two people are dead.  One was a completely and random act of violence with no comprehensible motive.  Three more people were shot but lived. . . . These shots were fired while Mr. Lord was a convicted felon.  They were shot with guns and ammunition that had been stolen or taken shortly beforehand.  One person was hit on the head with a hammer and injured.  One living room window was shot.  Two moving cars were shot and hit.  All by Mr. Lord.  There were shots fired at law enforcement.  There was an arson and there was theft of motor vehicles and the guns, and [Lord] was on probation at the time.

[¶34]  The court concluded in step one that the convicted felon's seemingly unending reign of violence, both targeted and random, constituted an aggravating circumstance, and we find no fault with that determination. The court did not misapply legal principles in considering the nature of the two murders as part of a violent rampage directed toward specific individuals and toward the public at large when determining that a basic sentence of life imprisonment was appropriate. *See Hayden*, 2014 ME 31, ¶ 17, 86 A.3d 1221; *Shortsleeves*, 580 A.2d at 150-51. Nor did the court err in considering Lord's prohibited possession of a firearm. *See Waterman*, 2010 ME 45, ¶¶ 25, 45, 995 A.2d 243. The court properly considered the conduct that surrounded the murders in determining the nature and seriousness of each murder. *See Downs*, 2009 ME 3, ¶ 20, 962 A.2d 950 (affirming the consideration of other criminal conduct in setting a basic sentence when that conduct provided evidence of the motive for the crime being sentenced).

2.    Step Two Application

[¶35]  The court did not repeat its consideration of the objective aspects of Lord's criminal history in step two of the analysis. *See* 17-A M.R.S. § 1252-C(1)-(2). In step one, the court considered that Lord was not allowed to possess a firearm as a condition of his probation. Although this prohibition

arose from Lord's criminal history, the court considered it in a way that was distinct from the fact that Lord has a criminal history. Lord's violation of his probation was appropriately considered in step one as an aggravating circumstance regarding the "nature and seriousness" of the offenses committed. Separately, the court was not precluded from considering in step two the fact that Lord also had a significant criminal history.

[¶36] We also note that the court appropriately considered as an aggravating factor in step two the profound effect of the crimes on the families of the murder victims. *See Sweet*, 2000 ME 14, ¶ 18, 745 A.2d 368 (considering the effect of the crimes on the victims). It addressed the first murder victim's consciousness of his impending demise as he tried to talk to his mother and the horror that the second murder victim undoubtedly felt as Lord "brandished the gun" and shot him at point blank range. Consideration of the devastating effect on the murder victims' loved ones left behind and the knowledge of the violence about to descend are proper and classic aspects of the step two analysis.

[¶37] Finally, contrary to Lord's argument, the court did not overlook the mitigating factors, including Lord's genuine love for his son, his post-traumatic stress following his son's death, the support of his family, and the fact that he took full responsibility for his actions in pleading guilty. The court committed

22

no error in concluding that those mitigating factors simply were not enough to reduce the murder sentences from life in prison.

## III. CONCLUSION

[¶38]  The court engaged in the proper considerations at each step of the sentencing analysis, and it thoughtfully considered whether a life sentence should ultimately be imposed.  The court's recognition of Lord's violent and persistently dangerous conduct at the time of the murders constituted neither a misapplication of legal principles nor an abuse of discretion.  *See Hayden*, 2014 ME 31, ¶ 17, 86 A.3d 1221.

The entry is:

Judgment affirmed.[9]

Andrea S. Manthorne, Esq. (orally), Roach, Hewitt, Ruprecht, Sanchez & Bischoff, Portland, for appellant Anthony Lord

Janet T. Mills, Attorney General, Donald W. Macomber, Asst. Atty. Gen. (orally), and Abaigeal M. Ridge, Stud. Atty., Office of the Attorney General, Augusta, for appellee State of Maine

Aroostook County Unified Criminal Docket docket number CR-2015-30062
Penobscot Unified Criminal Docket docket number CR-2015-2550
FOR CLERK REFERENCE ONLY

---

9  The docket entry for the amount of restitution shall be corrected as ordered in footnote 7.