MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2020 ME 128
Docket:      Cum-19-399
Argued       September 15, 2020
Decided:     November 3, 2020

Panel:       MEAD, GORMAN, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.

STATE OF MAINE

v.

JOHN D. WILLIAMS

HUMPHREY, J.

[¶1]  On an April night in 2018, a deputy sheriff attempted to arrest John D. Williams on drug charges outside a home in Norridgewock.  Early the following morning, the deputy sheriff's body was found on the lawn of that home.  Williams now appeals from the judgment of conviction entered by the court (Cumberland County, *Mullen*, *J.*) after a jury found him guilty of intentional or knowing murder of the deputy sheriff.  *See* 17-A M.R.S. § 201(1)(A) (2020). Williams raises three issues in this appeal challenging the court's admission of in-court demonstrations of the possible circumstances of the shooting, the court's partial denial of a motion to suppress statements he made to detectives after his arrest, and, finally, the court's sentencing

proceedings and the length of the sentence it imposed. We affirm the judgment and the sentence.

## I. BACKGROUND

A.    Facts

[¶2]  Viewing the evidence in the light most favorable to the State, the jury rationally could have found the following facts beyond a reasonable doubt. *See State v. Ouellette*, 2019 ME 75, ¶ 11, 208 A.3d 399.

[¶3]  On April 21, 2018, Somerset County Deputy Sheriff Corporal Eugene Cole and another deputy stopped Williams's car because they saw that it was being driven by his girlfriend, whose driving privileges they knew were suspended. Williams was a passenger in the vehicle. Williams's girlfriend was arrested for operating a vehicle while her license was suspended. The deputies determined that Williams could not drive the vehicle from the scene because he appeared to be under the influence of drugs and the vehicle's insurance had lapsed. Williams left the scene with a friend who arrived to pick him up.

[¶4]  Arrangements were made for the car to be towed from the scene. When illegal drugs were found during a subsequent search of the vehicle, a supervising officer authorized Corporal Cole and the other deputy to arrest Williams on drug charges.

[¶5] On the night of April 24, 2018, Williams was using drugs at a friend's house when he asked another friend to drive him to a home in Norridgewock where he had lived for a period of time when he was growing up. Williams wanted to borrow the homeowner's car to transport some of his guns to a location in Old Town because he had to be in court in Massachusetts the following day and he wanted to make sure his weapons were safe. The friend agreed to drive Williams to Norridgewock.

[¶6] While parked at the home in Norridgewock, Williams and his friend saw Corporal Cole's police truck slow down as it passed the house. Williams removed a duffel bag containing his guns from the trunk of his friend's car and placed them next to the vehicle he planned to borrow. The friend then left.

[¶7] Williams climbed the front steps of the home and tried to enter, but the door was locked. At that point, Corporal Cole approached Williams from behind and asked if he was John Williams. Once Williams confirmed his identity, Corporal Cole told Williams that he was under arrest and attempted to grab his wrist to take him into custody. Williams pulled away and drew a 9mm pistol from his waistband. Corporal Cole stepped back and then slipped and fell on a grassy slope. Williams shot Corporal Cole once in the right side of the neck at close range.

[¶8]  Williams fled in Corporal Cole's police truck and drove to a nearby Cumberland Farms store, where he stole a bottle of water, cigarettes, and a lighter.  The store clerk called 9-1-1, and the dispatcher notified another deputy to respond to the store.

[¶9]  After Williams left the store, he called a friend and told him that he had shot Corporal Cole.  Williams then asked his friend to meet him on Martin Stream Road, where Williams hid the police truck behind a house.  As the friend was driving to meet Williams, he saw a deputy sheriff at the nearby Cumberland Farms store and pulled over to tell him that the person who shot Corporal Cole was on Martin Stream Road.  The friend then continued on to meet Williams.

[¶10]  When the friend arrived, Williams asked if he could use his car.  The friend refused, and Williams asked to borrow his cell phone, saying that he was going to go into the woods, use the phone to make a confession, and then kill himself.  The friend let Williams take his phone and then dropped him off near some train tracks about a half-mile away on Martin Stream Road.

[¶11] The State Police Tactical Team was called in to locate both Corporal Cole and Williams.  Based on the information that Williams's friend had provided, team members located Corporal Cole's police truck.  Law enforcement also set up a command post at a fire station in Norridgewock.  The

fire station was across the street from the house where Corporal Cole had been shot.

[¶12]  In the morning hours of April 25, 2018, the owner of the Norridgewock house went outside and saw a body on her lawn.  She screamed and called for help, attracting the attention of officers at the fire station, who came over and saw Corporal Cole's body, with an apparent gunshot wound to the neck.  Members of the State Police Evidence Response Team arrived and found a bullet and casing on the lawn and a bulletproof vest, shotgun, holster, and a backpack containing ammunition in a car on the property.

[¶13]  Corporal Cole's body was taken to the State Medical Examiner's Office.  An autopsy concluded that the cause of death was a close-contact gunshot wound to the right side of the neck below the ear "which perforated the cervical spinal cord."

[¶14]  Meanwhile, a manhunt for Williams was underway.  On April 28, 2018, officers came upon a remote camp in the area of Bear Mountain Road and set up a perimeter.  The officers heard a banging noise and saw Williams come out of the camp shirtless, carrying a clear plastic tote, and wearing only a pair of long johns.  Officers quickly surrounded Williams.  He was taken to the ground and placed under arrest.

6

[¶15]  While placing handcuffs on Williams, one of the officers punched Williams in the head "two or three times" when it appeared that he was refusing to move his right hand.[1]  One officer pulled down Williams's long johns to make sure he did not have a gun in his waistband and, observing that Williams had defecated, removed the long johns.  A photo was taken showing an officer pulling Williams's head up by his hair while he was lying on his stomach.  The officers then reported to the command post that they had Williams in custody.

[¶16]  After approximately twenty minutes, a tactical team arrived and walked Williams out of the woods.[2]  Williams remained naked and barefoot while waiting for the tactical team to arrive and for most of the ten-minute walk, but he was wrapped in a blanket before exiting the woods.  Two Major Crimes Unit detectives who met Williams near the edge of the woods said they would like to speak with him, and Williams agreed.  The detectives—who had not been involved in the arrest—took custody of Williams from the arresting officers and walked him to their cruiser.

---

[1]  Williams may have been unable to physically comply with the officer's request because another officer was standing on Williams's right hand.

[2]  While Williams was being escorted out of the woods, Evidence Response Team members searched the camp and found a 9mm Ruger handgun, a machine pistol, and ammunition.  Although testing of the bullets recovered from the crime scene was inconclusive, the casing found near Corporal Cole's body matched the Ruger recovered from the cabin.

[¶17]　　The detectives drove Williams to the Waterville Police Department.  He was alert and responsive to the detective's questions about his physical condition, reporting that while he was not injured,[3] he was cold and hungry, and his hands hurt.

[¶18]  The detectives brought Williams to an interrogation room at the police department, where he was examined by emergency medical personnel and medically cleared.  The detectives then interviewed Williams and gave him food, water, fruit punch, and clothing.  The detectives began the interview by reading Williams his *Miranda* rights and confirmed that he understood them.  Approximately nine minutes after waiving his *Miranda* rights, Williams confessed to killing Corporal Cole.  Later, approximately ninety minutes into the interview, Williams described and participated in a reenactment of the shooting with the detectives and other officers.

B.　　Procedural History

[¶19]　　On April 25, 2018, Williams was charged by complaint with intentional or knowing murder, 17-A M.R.S. § 201(1)(A), and with the consent of the parties, the court ordered that the case be transferred from Somerset

---

[3] At one point during the drive to the police department, Williams stated, "They did a number on me," an apparent reference to the officers who arrested him at the remote campsite.

8

County to Cumberland County on April 30, 2018. M.R.U. Crim. P. 21(b)(2).

Later, on June 7, 2018, the Cumberland County Grand Jury handed down an

indictment charging Williams with intentional or knowing murder, 17-A M.R.S.

§ 201(1)(A). Williams pleaded not guilty.

[¶20] On August 27, 2018, Williams moved to suppress his confession

and other statements to the detectives, including the reenactment of the

shooting, arguing that they were not voluntarily given because he was fatigued,

hungry, suffering from drug withdrawal, and fearful for his safety because he

had been "beat[en] and pummeled" by officers during his arrest. The court held

hearings on Williams's motion to suppress on February 28, March 1, and

April 8, 2019. The court granted the motion in part, suppressing only

(1) statements made by Williams later in the interview, (2) Williams's

participation in the reenactment of the shooting at the police station, and

(3) the statements Williams made during that reenactment and afterward.[4]

[¶21] A six-day jury trial took place in June 2019. During the trial, the

court allowed the State to introduce expert testimony from Investigator Larry

---

[4] Specifically, the court suppressed the reenactment and all statements made after the 1:28:47 mark of the video admitted at the suppression hearing as State's Exhibit 2, but denied the motion to suppress as to Williams's statements made up to the 1:28:46 mark. State's Exhibit 84, admitted at trial, is the portion of the video that was not suppressed.

Morrill of the Office of the State Fire Marshal describing how the shooting may have occurred. Based on Morrill's testimony, the court permitted the State to conduct a courtroom reenactment of the shooting. Before the reenactment began, the court gave a limiting instruction to the jury stating that the reenactment only represents "the State's version of the events," that it should not be seen as "an actual re-creation of the crime," and that the jury is free to accept or reject it "in whole or in part."

[¶22] The jury returned a verdict of guilty on the sole count of intentional or knowing murder. The court imposed a sentence of life imprisonment after a sentencing hearing and entered a judgment of conviction on September 12, 2019.

[¶23] Williams timely appealed from the judgment of conviction, 15 M.R.S. § 2115 (2020); M.R. App. P. 2B(b)(1), and also applied for leave to appeal his sentence, 15 M.R.S. §§ 2151, 2153 (2020); M.R. App. P. 20. The Sentence Review Panel granted Williams's application for leave to appeal his sentence on November 19, 2019. *State v. Williams*, No. SRP-19-398 (Me. Sent. Rev. Panel Nov. 19, 2019); *see also* 15 M.R.S. § 2152 (2020); M.R. App. P. 20(g), (h).

## II. DISCUSSION

### A.  In-Court Demonstration

[¶24]  Williams first argues that the court abused its discretion in permitting the State to introduce an in-court physical reenactment of how the shooting may have occurred based on the testimony of Investigator Morrill.  He contends that Morrill was not qualified as an expert to give an opinion on shooting reconstruction or bloodstain pattern analysis and that the opinion itself was not relevant.  *See* M.R. Evid. 702, 401.

### 1.  Expert Opinion and Relevance

[¶25]  We review "a court's foundational finding that expert testimony is sufficiently reliable for clear error" and its ultimate decision on the admissibility of expert opinion testimony for an abuse of discretion.  *State v. Maine*, 2017 ME 25, ¶ 16, 155 A.3d 871 (quotation marks omitted).  Maine Rule of Evidence 702 provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if such testimony will help the trier of fact to understand the evidence or to determine a fact in issue."  To be admissible under Rule 702, expert testimony must be relevant and must "assist the trier of fact in

understanding the evidence or determining a fact at issue." *State v. Burbank*, 2019 ME 37, ¶ 8, 204 A.3d 851 (quotation marks omitted).

[¶26] Expert testimony is relevant if the proponent, among other requirements, "has presented a sufficient demonstration of reliability." *Id.* Common indicia of reliability include "whether an expert's conclusion has been tailored to the facts of the case," "whether any other experts attest to the reliability of the testimony," and "the nature of the expert's qualifications." *Maine*, 2017 ME 25, ¶ 17, 155 A.3d 871.

[¶27] Investigator Morrill testified in great detail about his specialized training and experience in shooting reconstruction, trajectory analysis, and bloodstain pattern analysis. He then testified as to his opinion of how the shooting may have occurred and thoroughly explained what he did at the scene and the basis for his opinion. His conclusions were drawn from the facts of this case, and his work was peer-reviewed by longstanding experts in the field. *See id.* On this record, we conclude that the court did not clearly err in finding that Investigator Morrill's qualifications in shooting reconstruction were sufficient for him to testify on the matter and that his testimony was sufficiently reliable and would be helpful to the jury "to understand the evidence or to determine a fact in issue." M.R. Evid. 702. Further, the court did not abuse its discretion in

admitting Investigator Morrill's testimony after finding it reliable. *See Maine*, 2017 ME 25, ¶¶ 16-17, 155 A.3d 871. Finally, there can be no doubt that Investigator Morrill's opinion was relevant. M.R. Evid. 401.

2. Unfair Surprise

[¶28] Williams next argues that he was unfairly surprised, meaning prejudiced, by the in-court reenactment of the shooting because he was not shown the actual demonstration until the voir dire of Investigator Morrill during trial. *See* M.R. Evid. 403. And, in line with this argument, he contends that the trial court abused its discretion in denying his motion for a mistrial based on that unfair surprise.

[¶29] We review a trial court's admission of evidence over a Rule 403 objection for an abuse of discretion. *State v. Michaud*, 2017 ME 170, ¶ 8, 168 A.3d 802. Rule 403 provides that even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." M.R. Evid. 403.

[¶30] In-court demonstrative evidence is especially persuasive, and we have held that a trial court should "carefully" exercise its discretion before allowing such evidence because it "may convey an impression of objective

reality to the trier [of fact]." *State v. Philbrick*, 436 A.2d 844, 859-60 (Me. 1981).

In *Philbrick*, we noted the dangers that demonstrative evidence, especially

evidence that does not have a proper scientific foundation, may pose to a jury:

> Such experimental demonstrative evidence in the eyes of jurors, because of its asserted foundation in scientific principle or technique, carrie[s] such an inherent objective impact that it could unduly influence the jury in its findings of the underlying necessary facts at issue, without adequate basic facts to sustain a scientific conclusion . . . .

*Id.* at 860.  There, we concluded that the court erroneously admitted an alleged

expert's demonstration of the shooting because it had not been shown that the

demonstration was substantially similar to the actual events of the shooting

and it was based on unreliable scientific methods.  *Id.* at 859-60.

[¶31]   Here, the court determined that the demonstration was not

unfairly prejudicial and did not waste time or confuse the issues.  M.R. Evid.

403.  To the contrary, the court reasoned that Investigator Morrill's testimony

and the demonstration helped clarify and tie together the testimony of previous

witnesses.  The court also found that unlike in *Philbrick*, Investigator Morrill

was qualified to present his opinion and the report he prepared that served as

the basis for the demonstration was verifiable and scientifically accurate.

[¶32]  Most importantly, before allowing the demonstration to proceed,

the court instructed the jury that it represented "only a re-creation of the State's

version of the events" that "should in no way be viewed as an actual re-creation of the crime" and could "be accepted or rejected in whole or in [p]art." In crafting this instruction, the court looked to language found in *Harris v. State*, 13 P.3d 489, 496 (Okla. Crim. App. 2000), which in turn, relied on a limiting instruction created in *Clark v. Cantrell*, 529 S.E.2d 528, 537 (S.C. 2000).

[¶33] We commend the court's use of this language. With respect to demonstrative or reenactment evidence, the court's limiting instruction addressed the major concern we expressed in *Philbrick*, namely that such evidence tends to be highly prejudicial to a jury by "convey[ing] an impression of objective reality to the trier [of fact]." 436 A.2d at 859. The court's instruction alleviated this danger by making it clear that the demonstration only represented the State's version of events and should not be seen as an actual re-creation of the crime as it occurred. Therefore, we conclude that the trial court did not abuse its discretion in allowing the demonstration to be presented to the jury over Williams's Rule 403 objection.

3.    Motion for a Mistrial

[¶34] Next, Williams contends—also based on his claim that he was unfairly surprised by the State's in-court demonstration because he had no notice, until the fourth day of trial, that the State would be re-creating the

shooting—that the court abused its discretion in denying his motion for a mistrial.[5]  We review the denial of a motion for a mistrial for an abuse of discretion and "will overrule the denial of a mistrial only in the event of exceptionally prejudicial circumstances or prosecutorial bad faith."  *State v. Logan*, 2014 ME 92, ¶ 14, 97 A.3d 121 (quotation marks omitted).  "A motion for a mistrial should be denied except in the rare circumstance that the trial is unable to continue with a fair result and only a new trial will satisfy the interests of justice."  *State v. Poblete*, 2010 ME 37, ¶ 26, 993 A.2d 1104 (quoting *State v. Bridges*, 2004 ME 102, ¶ 11, 854 A.2d 855).

[¶35]  Notwithstanding Williams's contention, the record indicates that, although Williams saw the State's physical demonstration of the shooting for the first time on the fourth day of the trial, he had received a copy of Investigator Morrill's report approximately five months before trial.  That report concluded that there were two possible scenarios or explanations for Corporal Cole's positioning at the time he was shot, which was consistent with

---

[5]  Williams's motion for a mistrial was prompted by an overnight conversation that Williams's attorney had with an expert between the fourth and fifth days of trial.  During that conversation, the expert purportedly said that he believed that the State's demonstration was inaccurate.  By that time, Williams had been in possession of Investigator Morrill's report and conclusions for five months, and it is unclear why he waited until the middle of trial to consult with his expert.

Investigator Morrill's testimony[6] at trial and with the demonstration itself. The record also suggests that before trial, the State had informed Williams of its intent to present an in-court physical demonstration of Investigator Morrill's conclusions regarding the positions of the shooter and the victim.

[¶36]  Further, if Williams wanted to offer expert testimony to challenge the accuracy of the State's demonstration, the State offered to join with Williams in a request that the court hold the evidence open to allow Williams to retain the expert with whom he had consulted after the State's demonstration.  Williams declined this offer for strategic reasons, however, because although Williams's expert apparently disagreed with portions of the in-court demonstration, the expert agreed with many of Investigator Morrill's conclusions regarding the proximity of the gun to Corporal Cole's neck and Corporal Cole's position on the ground.

[¶37]  In short, on this record, there is no evidence of "exceptionally prejudicial circumstances or prosecutorial bad faith" that would provide grounds for overruling the court's denial of Williams's motion for a mistrial.

---

[6]  In addition to being consistent with his pretrial report, Investigator Morrill's testimony was consistent with, and tied together, the already overwhelming evidence against Williams, including the physical evidence and Williams's own confession.  It is therefore unlikely that the verdict would have been different if the demonstration had been excluded.

*Logan*, 2014 ME 92, ¶ 14, 97 A.3d 121 (quotation marks omitted). Although Williams did not see the physical demonstration of the shooting until the fourth day of trial, the State had informed Williams of its intent to re-create the shooting during trial, and the demonstration itself closely tracked Investigator Morrill's testimony as well as his report.

[¶38] Under these circumstances, the State's demonstration did not unduly prejudice Williams or prevent him from receiving a fair and just trial. *See Bridges*, 2004 ME 102, ¶ 10, 854 A.2d 855 ("The court's determination of whether exposure to potentially prejudicial extraneous evidence would incurably taint the jury verdict or whether a curative instruction would adequately protect against consideration of the matter stands unless clearly erroneous." (quotation marks omitted)); *see also State v. Frisbee*, 2016 ME 83, ¶ 29, 140 A.3d 1230 ("Ultimately, the decision on whether to grant a defendant's motion for a mistrial comes back to the core principles of fairness and justice; the relevant question for the trial court is whether the trial court is confident that the trial can proceed to a fair and just verdict in the context of the proceedings before it."). We conclude that the trial court did not abuse its discretion in denying Williams's motion for a mistrial.

18

B.       Motion to Suppress

[¶39]   The court concluded that all of Williams's statements to the interviewing detectives up to the 1:28:46 mark on the interrogation video were voluntary and denied the motion to suppress his statements up to that point. The court granted the motion to suppress his statements made after the 1:28:46 mark along with Williams's subsequent reenactment of the shooting.

[¶40]  Williams contends that all of his statements to the detectives were involuntary and should have been excluded.   Williams's voluntariness argument is in two parts: First, he contends that the court "completely ignored and dodged [his] argument regarding his reasonable fear based on his interactions with the arrest and transport teams."  More specifically, he argues that his treatment by the arresting officers caused him to fear for his safety and led him to believe that if he did not cooperate with police, including the detectives, he would face physical retaliation.  Second, Williams contends that his fatigue, hunger, and drug withdrawal affected his ability to knowingly and voluntarily waive his right to remain silent or provide voluntary statements.

[¶41]  "We review the denial of a motion to suppress for clear error as to factual issues and de novo as to issues of law, and will uphold the court's denial of a motion to suppress if any reasonable view of the evidence supports the trial

court's decision." *State v. Ormsby*, 2013 ME 88, ¶ 9, 81 A.3d 336 (quotation marks omitted).

[¶42] "A confession is admissible in evidence only if it was given voluntarily, and the State has the burden to prove voluntariness beyond a reasonable doubt." *State v. Wiley*, 2013 ME 30, ¶ 15, 61 A.3d 750; *see also State v. Rees*, 2000 ME 55, ¶ 6, 748 A.2d 976. "The voluntariness requirement gives effect to three overlapping but conceptually distinct values: (1) it discourages objectionable police practices; (2) it protects the mental freedom of the individual; and (3) it preserves a quality of fundamental fairness in the criminal justice system." *Wiley*, 2013 ME 30, ¶ 16, 61 A.3d 750 (quoting *State v. Sawyer*, 2001 ME 88, ¶ 8, 772 A.2d 1173).

[¶43] A voluntary confession is one that "results from the free choice of a rational mind, if it is not a product of coercive police conduct, and if under all of the circumstances its admission would be fundamentally fair." *Wiley*, 2013 ME 30, ¶ 16, 61 A.3d 750 (quotation marks omitted). In determining whether a confession is voluntary, we examine the totality of the circumstances, which includes both external and internal factors, such as

> the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of Miranda warnings; the number of officers involved; the persistence of the officers; police trickery;

threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct.

*State v. Sawyer*, 2001 ME 88, ¶ 9, 772 A.2d 1173; *see, e.g.*, *State v. Mikulewicz*, 462 A.2d 497, 501 (Me. 1983).

[¶44] Williams first argues that his confession was not voluntary because the use of force by the arresting officers caused him to be in "fear of further beating" if he did not cooperate with the detectives when they interviewed him. The court found that Williams had been punched by an arresting officer "at a time when he was handcuffed and offering no significant resistance,"[7] and that he had been held down, naked, on the ground for approximately twenty minutes before being escorted out of the woods.[8]  Nevertheless, the court, informed by *Leon v. State*, 410 So. 2d 201 (Fla. Dist. Ct. App. 1982), and *Lyons v. Oklahoma*, 322 U.S. 596 (1944), determined that the effect on Williams of the "initial impropriety by law enforcement" in the woods did not render his later confession involuntary.

---

[7] Although Williams suggests that he defecated on himself *because of* the punches inflicted on him during his arrest, his own expert witness testified that it was not plausible that fear and stress caused him to defecate; rather, the expert testified, it was far more likely that he did so because of opiate withdrawal and gastrointestinal symptoms.

[8]  The court also rejected the assertion by an arresting officer that pulling Williams's head up by his hair had been necessary to confirm his identity.

[¶45]  In *Lyons*, police obtained an initial, involuntary confession from a defendant using coercive interrogation techniques before obtaining a second, voluntary confession from the defendant later in the day.  322 U.S. at 598-601.  The Court stated that "[t]he question of whether those confessions subsequently given are themselves voluntary depends on the inferences as to the continuing effect of the coercive practices which may fairly be drawn from the surrounding circumstances."  *Id.* at 602.  Despite the initial impropriety, the Court affirmed the voluntariness of the defendant's second confession.  *Id.* at 605.  In reaching that conclusion, the Court noted that twelve hours elapsed between the two confessions and that the second confession was given to individuals who had not engaged in the initial, coercive interrogation.  *Id.* at 604-05.

[¶46]  Similarly, in *Leon*, the District Court of Appeal of Florida concluded that "under appropriate circumstances, the effect of an initial impropriety, even a coercive one, in securing a confession may be removed by intervening events, with the result that a subsequent statement is rendered free of the primary taint and thus admissible into evidence as the expression of a free and voluntary act."  *Leon*, 410 So. 2d at 203 (quotation marks omitted).  Under the

Florida court's reasoning, the most significant factor in its analysis was whether force was or was not-inflicted in order to secure the defendant's confession. *Id.*

[¶47]  Here, the court found that the arresting officers' treatment of Williams was not for the purpose of obtaining his confession. *See id.* (collecting cases).  Williams was not asked any questions about the crime during his arrest and transport out of the woods, the interrogation itself was conducted by two detectives who were not present in the woods during the arrest, the arresting officers had no further interaction with Williams after he was handed off to the detectives, and they were not present during the interrogation, which took place at the Waterville Police Department away from the scene of the arrest. Further, the interrogating detectives did not threaten, make any promises, or offer any inducements to Williams, *see Wiley,* 2013 ME 30, ¶¶ 18-30, 61 A.3d 750, and they gave Williams *Miranda* warnings before questioning him.

[¶48]  Thus, we conclude that the trial court did not err in determining that under the totality of the circumstances, the inappropriate force used during Williams's arrest did not render involuntary his later confession and other statements to the detectives. *See Sawyer*, 2001 ME 88, ¶ 9, 772 A.2d 1173; *People v. Richardson*, 917 N.E.2d 501, 516-17 (Ill. 2009) (stating that in determining whether incidental use of physical force renders a confession

involuntary, "[c]ourts look to factors such as gaps in time between the use of force and the confession, changed interrogators or location, and renewed *Miranda* warnings"); *see also Lyons*, 322 U.S. at 602-05; *United States v. Denton*, 246 F.3d 784, 786-88 (6th Cir. 2001). *But see United States v. Jenkins*, 938 F.2d 934, 939-40 (9th Cir. 1991); *United States v. Gonzalez*, 719 F. Supp. 2d 167, 181-83 (D. Mass. 2010).

[¶49]  Turning to Williams's second contention regarding his physical condition at the time of the interrogation, the court did not clearly err in determining that, at least up to the 1:28:46 mark on the video, Williams's prior drug use or withdrawal did not actually impair his physical or mental condition. We and other courts have held that addiction to, use of, or withdrawal from drugs does not automatically render an otherwise voluntary confession involuntary. *See State v. Ashe*, 425 A.2d 191, 193-94 (Me. 1981); *see also United States v. Palmer*, 203 F.3d 55, 61-62 (1st Cir. 2000); *People v. Johnson*, 168 Misc. 2d 81, 89 (N.Y. 1995). Rather, as we stated in *Ashe*, "[t]he particular circumstances of each case must be evaluated to determine whether a defendant's drug-related condition made him incapable of acting voluntarily, knowingly and intelligently." 425 A.2d at 194.

24

[¶50]  Here, as the trial court found, Williams "appear[ed] to be rational and responded to questions with appropriate answers," he did "not disclose any bizarre, psychotic, or drug-induced behavior," and he did not "exhibit any fear or resistance to speaking."  Like the defendant in *Ashe,* Williams "appeared lucid and rational, able to respond coherently to questions, and able to engage in a narrative account of the events in question" while being questioned by the detectives.  *See id.*  Prior to questioning at the police station, Williams had been examined by emergency medical personnel who concluded that he was "medically clear," and Williams declined their offer to be checked out further.

[¶51]  During the questioning, detectives provided Williams with a blanket, clothing, food, water, and, at Williams's specific request, fruit punch, because he was cold, hungry, and thirsty.  *Cf. State v. Blank*, 955 So. 2d 90, 106-08 (La. 2007); *but see People v. Anderson*, 364 N.E.2d 1318, 1321 (N.Y. 1977).  Williams confessed early in the interview, and the unsuppressed portion of the interview was not particularly lengthy, lasting less than ninety minutes.  *Cf. Berghuis v. Thompkins*, 560 U.S. 370, 386-87 (2010) ("It is true that apparently he was in a straight-backed chair for three hours, but there is no authority for the proposition that an interrogation of this length is inherently coercive."); *Blank*, 955 So. 2d at 105-06; *Commonwealth v. Tucker*, 335 A.2d 704,

708 (Pa. 1975). The detectives treated Williams well and were calm and respectful of him throughout the interview, which Williams himself acknowledged. *See Blank*, 955 So. 2d at 106-08.

[¶52] Finally, up until the 1:28:46 mark, when he repeatedly requested a nap, Williams did not ask to stop the interview at any point. *See id.* at 107. Williams did not tell the officers that he was tired or needed a nap until approximately one hour and twenty-seven minutes into the interview. *See State v. Timmendequas*, 737 A.2d 55, 110 (N.J. 1999) (noting that the "defendant never indicated to officers that he was too tired or hungry to continue"). Up until that point, "there was no evidence that authorities exploited any slowly mounting fatigue resulting from prolonged questioning, or that such fatigue occurred or played any role in defendant's decision to confess." *People v. Williams*, 233 P.3d 1000, 1031 (Cal. 2010) (quotation marks omitted). *But cf. Spano v. New York*, 360 U.S. 315, 321-24 (1959) (concluding that the suspect's will was overborne by "slowly mounting fatigue" during an eight-hour interrogation involving fifteen different questioners, during which the questioners persisted in the face of the suspect's refusal to answer on the advice of his attorney and refused his requests to contact his attorney). The court correctly found, however, that after the one-hour-and-twenty-minute mark,

Williams's fatigue and weakness reached a point where his statements were no longer voluntary. *See State v. Kierstead*, 2015 ME 45, ¶¶ 16-17, 114 A.3d 984.

[¶53] Considering the totality of the circumstances, we conclude that the trial court did not err in denying Williams's motion to suppress as to his confession and other statements made up until the 1:28:46 mark on the video. *Ormsby*, 2013 ME 88, ¶ 29, 81 A.3d 336; *Sawyer*, 2001 ME 88, ¶ 9, 772 A.2d 1173.

C.    Sentencing

[¶54]  Williams argues that "the sentencing court had pre-determined [his] sentence in this matter[] before the sentencing hearing" and that "the [c]ourt did not consider any of [his] sentencing arguments strongly mitigating against a life sentence, since the [c]ourt had clearly already made its decision before the parties even presented their arguments."

[¶55]  In sentencing a defendant after a conviction for murder, the sentencing court employs a two-step sentencing process. 17-A M.R.S. § 1602(2) (2020).  First, the court must "determine a basic term of imprisonment by considering the particular nature and seriousness of the offense as committed." 17-A M.R.S. § 1602(1)(A).  Then, the court must "determine the maximum term of imprisonment to be imposed by considering all other relevant sentencing

factors, both aggravating and mitigating, appropriate to the case." *Id.* § 1602(1)(B).

[¶56] We "review the court's determination of the basic sentence on the first step of the analysis de novo for misapplication of law." *State v. Holland*, 2012 ME 2, ¶ 38, 34 A.3d 1130. We also review "the sentencing court's determination of the basic period of incarceration for misapplication of sentencing principles" and "for an abuse of the court's sentencing power." *State v. Nichols*, 2013 ME 71, ¶ 13, 72 A.3d 503. The maximum sentence set by the court is reviewed for an abuse of discretion. *See State v. Sweet*, 2000 ME 14, ¶ 15, 745 A.2d 368. Finally, we review the sentence imposed for "disregard of the relevant sentencing factors or abuse of the court's sentencing power." *State v. Koehler*, 2012 ME 93, ¶ 32, 46 A.3d 1134.

[¶57] "A person convicted of the crime of murder must be sentenced to imprisonment for life or for any terms of years that is not less than 25." 17-A M.R.S. § 1603(1) (2020). The murder of a law enforcement officer while in the performance of his or her duties is an aggravating circumstance that may justify the imposition of a life sentence. *State v. Shortsleeves*, 580 A.2d 145, 149-50 (Me. 1990).

28

[¶58]   In determining the basic sentence at step one, the court was mindful of its duty to "consider the particular nature and seriousness of the crime," weighing "the convicted person's conduct against other more heinous and less heinous possible ways of committing the crime."   The court also articulated the purposes and goals of sentencing that it considered appropriate to the case.   Finally, the court observed that the authorized range was imprisonment for twenty-five years to life.  *State v. Lord*, 2019 ME 82, ¶ 25, 208 A.3d 781*.*  As for the nature and seriousness of the crime, the court noted that this was the murder of a police officer in the line of duty, an aggravating circumstance according to our precedent, *see id.* ¶¶ 27-28, 30, 32; *Shortsleeves*, 580 A.2d at 149-50, and that Williams decided to "eliminate" the deputy sheriff and then shot Corporal Cole in the neck at close range.  After looking to the laws of Maine and many other jurisdictions to aid in its effort to place this crime in context and fashion a basic sentence consistent with those imposed in other jurisdictions, the court determined that the basic sentence should be sixty-five years' imprisonment.[9]

[¶59]  The court then proceeded to step two and considered aggravating and mitigating factors to determine the maximum sentence.   17-A M.R.S.

---

[9]  Williams does not argue that the court erred in setting the basic sentence at sixty-five years.

§ 1602(1)(B); *Lord*, 2019 ME 82, ¶¶ 31-32, 208 A.3d 781. The court considered Williams's childhood upbringing and drug abuse but did not find these to be significant mitigating factors. The court found that the aggravating factors included the effect on Corporal Cole's family and the community; Williams's criminal history; the need to protect the public; Williams's "relative lack of remorse"; and his failure to take responsibility and ownership for his actions. The court concluded that "the aggravating factors greatly outweigh any mitigating factors" and "that the appropriate sentence in this case should be and is life in prison."

[¶60] Contrary to Williams's contention, nothing in the record suggests that the court had pre-determined that Williams's sentence would be life imprisonment. The court stated that "the question I have grappled with since the verdict was whether a life sentence was called for here," suggesting that the court did not impose a life sentence lightly and arrived at that sentence only after weighing the appropriate factors. Although Williams suggests that the court failed to "listen to arguments and statements from witnesses regarding mitigating circumstances," the court did, in fact, consider the information and

statements from Williams, his mother, and his aunt.[10]  There is simply no support in the record for Williams's contention that the court disregarded his arguments in mitigation.[11]

[¶61]  The court objectively considered and rationally weighed all of the information and arguments and determined that in Williams's case, the aggravating factors greatly outweighed those in mitigation.  *See State v. Basu*, 2005 ME 74, ¶ 24, 875 A.2d 686 (observing that a sentencing court is in a better position for evaluating the offender's circumstances and has wide discretion to weigh aggravating and mitigating factors).  We conclude that the court did not abuse its discretion in imposing a sentence of life imprisonment.[12]  *Sweet*, 2000 ME 14, ¶ 15, 745 A.2d 368 (stating that "the sentencing court is in a better

---

[10]  The court stated that it had reviewed the sentencing memoranda and statements submitted before the hearing more than once.

[11] Williams appears to believe that the court's rejection of his arguments in mitigation is the same as failing to consider his arguments at all.

[12]  The most closely analogous Maine case that the court considered as part of its analysis was *State v. Burdick*, 2001 ME 143, ¶¶ 1-2, 6, 782 A.2d 319, in which we upheld a sentence of forty years' imprisonment for a defendant charged with the *attempted murder* of a police officer.  Although the forty-year sentence in *Burdick* is significantly shorter than the life sentence imposed here, Burdick was fifty years old at the time of sentencing, rendering the forty-year sentence a "de facto life sentence," *id.* ¶ 25, and although he shot a law enforcement officer twice in the chest at close range, the officer was wearing a bulletproof vest and sustained only minor injuries, *id.* ¶ 6.  Here, the victim died as the result of an act described by the court as Williams's decision to "execute Corporal Cole." Taken together with other aggravating factors identified by the court, the court did not abuse its discretion in imposing a life sentence instead of a sentence for a term of years as in *Burdick*.  *See Sweet*, 2000 ME 14, ¶ 15, 745 A.2d 368.

position to review aggravating and mitigating factors"); *State v. Hewey*, 622 A.2d 1151, 1155 (Me. 1993) (stating that we "accord greater deference to the weight and effect given by the court to those factors peculiar to a particular offender in its determination of the offender's maximum period of incarceration").

The entry is:

Judgment affirmed.

---

Verne E. Paradie, Jr., Esq. (orally), Paradie & Rabasco, Lewiston, for appellant John D. Williams

Aaron M. Frey, Attorney General, and Donald W. Macomber, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Cumberland County Unified Criminal Docket docket number CR-2018-2275
FOR CLERK REFERENCE ONLY